**AMERICAN ROCKWOOL,
INC., Plaintiff,**

v.

**OWENS–CORNING FIBERGLAS
CORPORATION, Defendant.**

No. 83–39–CIV–8.

United States District Court,
E.D. North Carolina,
Wilson Division.

June 18, 1986.*

* This order is a redacted version of an order filed under seal in this case on February 14, 1986, and is issued for publication purposes.

See also 109 F.R.D. 263.

Robert W. Spearman, Catherine B. Arrowood, Sanford, Adams, McCullough & Beard, Raleigh, N.C., Michael J. Anderson, Anderson & Clayton, Rocky Mount, N.C., for plaintiff.

Edward S. Finley, Jr., Hunton & Williams, Raleigh, N.C., for defendant.

## ORDER

JAMES C. FOX, District Judge.

### I. PRELIMINARY STATEMENT

This case was instituted on May 4, 1983, as a federal antitrust action brought by Spring Hope Rockwool, Inc., (Spring Hope) a manufacturer of rockwool fiber insulation. One month and ten days later, a sister corporation, Casa Grande Rockwool, Inc. (Casa Grande) filed a second antitrust action against Owens-Corning Fiberglas Corporation (Owens-Corning OR OCF).[1] Casa Grande was merged into Spring Hope on July 1, 1983. Spring Hope changed its name to American Rockwool, Inc. (American Rockwool) on September 20, 1983. In the two initial complaints, as well as the First Amended and Consolidated Complaint filed in January, 1984, plaintiff alleged a wide variety of both federal and state antitrust and unfair trade actions, nine separate counts in all.[2] Plaintiff also asserted

---

1. On December 22, 1983, this court entered an Order consolidating these two cases into one action. Thereafter, plaintiff filed its First Amended and Consolidated Complaint.

2. Section 1 Sherman Act conspiracy to restrain trade; Section 2 Sherman Act monopolization

and attempt to monopolize; Section 3 of the Clayton Act exclusive dealing; Section 43(a) Lanham Act false advertising of one's own product; North Carolina's version of Sections 1 and 2 of the Sherman Act; North Carolina's unfair competition statute; North Carolina's willful de-

three common law claims: defamation, disparagement, and unfair competition. On December 9, 1985, plaintiff filed a motion for leave to file its Second Amended and Consolidated Complaint; subsequently, the court granted plaintiff's motion and this complaint was filed on January 21, 1986. By virtue thereof and stipulations of the parties, plaintiff has eliminated all claims except those hereafter discussed.[3] Defendant has also filed a counterclaim.[4]

After certain preliminary motions were resolved, broad discovery was undertaken by both sides. This discovery included interrogatories, production and review of voluminous business records, and the depositions of numerous party and non-party witnesses. The discovery in this case has been thorough and exhaustive. Accordingly, the extensive factual record on which plaintiff's claims and defendant's counterclaim are premised has been fully developed. The parties have filed cross-motions for summary judgment and have filed extensive briefs in support thereof. In addition, the court heard oral argument on these motions for two days—January 9–10, 1986. The motions are ripe for disposition, and the court enters this order in response thereto.

A. *Summary of Defendant's Argument*

The plaintiff's claims attack the sales and marketing practices of Owens-Corning during the years 1981 to the end of 1985. These claims are predicated upon Owens-Corning's advertising, technical bulletin, and promotional practices with respect to both plaintiff's products and Owens-Corning's products.

In essence, plaintiff's case has been reduced to causes of action for unfair competition under North Carolina's antitrust statutes; false advertising under the Lanham Act; and disparagement, and unfair competition under the applicable common law. Owens-Corning seeks summary judgment or at least partial summary judgment as to each of these claims.

Owens-Corning argues that the controlling law and undisputed facts support summary judgment on each claim in the following respects:

*First Claim for Relief.*

(1) North Carolina General Statute § 75–1.1 (§ 75–1.1) only applies to conduct occurring within the state of North Carolina. The statute has no application to publications, statements, prices or other conduct that plaintiff attributes to Owens-Corning in states such as Arizona, Texas, Florida, Tennessee, Georgia, etc. Accordingly, Owens-Corning seeks partial summary judgment on the grounds that § 75–1.1 does not apply to its alleged misconduct that occurred in states other than North Carolina.

(2) As to conduct occurring within the state of North Carolina, Owens-Corning argues that in order to establish a violation of § 75–1.1 plaintiff must prove that Owens-Corning's alleged misconduct had an adverse effect on competition in the relevant market, and that there is no evidence of such effect.

(3) As to conduct occurring within the state of North Carolina, Owens-Corning argues there is no evidence that Owens-Corn-

---

struction of a competitor statute; and North Carolina's version of the Robinson-Patman Act.

**3.** By stipulation of the parties, the following causes of action asserted by the plaintiff are dismissed with the same force and effect as if dismissed with prejudice pursuant to Rule 41 of the Federal Rules of Civil Procedure:
 a. common law claim of defamation;
 b. claim predicated on N.C.Gen.Stat. § 75–5(b)(2);
 c. claim predicated on N.C.Gen.Stat. § 75–5(b)(4); and
 d. claim predicated on N.C.Gen.Stat. § 75–5(b)(5).

Furthermore, plaintiff has abandoned its claims under N.C.Gen.Stat. §§ 75–1.1 and 75–5(b)(3) as they relate to conduct surrounding plaintiff's Casa Grande batt insulation products. Therefore, these claims, with respect to the Casa Grande operation, are also dismissed with the same force and effect as if dismissed with prejudice.

**4.** Defendant's counterclaim is predicated upon Section 43(a) of the Lanham Act—false advertising of one's own product and the common law claim of unfair competition.

ing's alleged misconduct proximately caused plaintiff to be damaged in an amount that can be established with a reasonable degree of certainty.

*Second Claim for Relief.*

(1) North Carolina General Statute § 75–5(b)(3) (§ 75–5(b)(3)) only applies to conduct occurring within the State of North Carolina. Said statute has no application to publications, statements, prices or other conduct that plaintiff attributes to Owens-Corning in states such as Arizona, Texas, Florida, Tennessee, Georgia, etc. Accordingly, Owens-Corning seeks partial summary judgment on the grounds that § 75–5(b)(3) does not apply to its alleged misconduct that occurred in states other than North Carolina.

(2) As to conduct occurring within the state of North Carolina, there is no evidence that Owens-Corning engaged in conduct in North Carolina that was designed willfully to destroy or injure the plaintiff for the purpose of "attempting to fix the price" of insulation once plaintiff is out of business as prohibited by § 75–5(b)(3), nor of any damage to plaintiff caused thereby.

*Third Claim for Relief.*

Plaintiff's claim under the Lanham Act, 15 U.S.C. § 1125(a), fails because plaintiff has not identified any evidence that Owens-Corning (a) made a false statement about its own product that (b) actually deceived or had the tendency to deceive a substantial number of customers and (c) plaintiff was or is likely to be injured as a result of such statements.

*Fourth Claim for Relief.*

As to the disparagement claim Owens-Corning takes the position that there is no evidence of a causal connection between Owens-Corning's alleged misconduct and any damage to plaintiff.

*Fifth Claim for Relief.*

There is no evidence of unfair competition other than the alleged disparagement of plaintiff's product.

B. *Summary of Plaintiff's Argument*

The defendant's counterclaim is predicated upon false advertising under the Lanham Act, and unfair competition under the applicable common law. In Count One of its counterclaim, defendant asserts that plaintiff has made false and misleading statements about the performance characteristics of its "Spring Brand" and "American" rockwool insulation, which have deceived and are likely to continue to deceive customers in their purchasing decisions. These statements allegedly have been made on the product labels themselves, as well as orally and in writing to various customers of plaintiff and defendant, in violation of Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a). Defendant alleges that the statements have injured it and are likely to continue to do so, in that its sales have been diverted to the plaintiff and there has been a lessening of the good will that defendant and its fiberglass insulation product enjoy with its customers.

In Count Two, defendant asserts that this same alleged conduct by plaintiff is unreasonable, unfair, illegitimate and unjustified, and as such constitutes unfair competition in violation of the common law.

With respect to defendant's Lanham Act claim, plaintiff asserts two bases for its motion for summary judgment: first, plaintiff contends that defendant cannot prove that plaintiff's bag labels are false with respect to the performance characteristics of its loosefill insulation; second, plaintiff argues that even assuming the falsity of its bag labels, defendant cannot prove that it was injured thereby. These same arguments apply to plaintiff's motion for summary judgment with respect to defendant's claim of unfair competition, in that the factual basis for both of defendant's claims is the same.

## II. STATEMENT OF FACTS

Owens-Corning is a Delaware corporation with its principal place of business in Toledo, Ohio. The principal business of Owens-Corning involves the manufacture of glass fiber products in two basic forms: (1) a wool-like material used for thermal

and acoustical insulation and other construction products, and (2) textile filaments which are combined into strands, yarns or mats and used for weaving fabrics and for reinforcing plastic, rubber and paper products. For example, Owens-Corning manufactures residential, industrial and commercial insulations, ceiling and roofing materials, and shingles which are purchased by all segments of the building construction industry.

American Rockwool traces its roots back to 1977 when it was formed by Oliver M. Gould, a resident of Dallas, Texas. Gould first became involved in the manufacture and sale of rockwool fiber insulation products in 1951 when he went to work for Rockwool Insulating in Pueblo, Colorado. Approximately four years later, Gould became president of Texas Rockwool, a successor to Rockwool Insulating of Colorado. Gould continued as president of Texas Rockwool until 1972. Thereafter, the name of the company was changed to Rockwool Industries, and Gould remained president until 1974. In 1974, Rockwool Industries terminated Gould's employment.

After a two year hiatus from the insulation industry, Gould decided to build his own rockwool factory in a section of the country where there were no other producers. He located his first rockwool plant in Spring Hope, North Carolina. Construction on the production line was begun in 1977 and completed by July of 1978. Gould and his wife are the sole stockholders of Spring Hope and its successor, American Rockwool. When Spring Hope first entered the insulation industry, it concentrated on selling to insulation contractors within a 400 mile radius of Rocky Mount, North Carolina.

During the first two years of operation, the company was substantially below Gould's projections as to gross sales. Gould attributed his inability to meet his initial projections in sales to two things;

first, there were start-up problems with the plant, and second, there was a recession in the building industry.

Gould also acknowledged that during the time period 1978 to 1980, he had complaints from customers regarding lack of "coverage" and dustiness with his product. The term "coverage" refers to the number of square feet a given volume of insulation material will cover. For example, the "Blowing Wool Installation Coverage Chart" which is printed on the bags utilized by American Rockwool indicate that one bag of material will provide an insulation value of R-11 in an area of 58 square feet. Stated another way, the coverage one can achieve with a 29 pound bag at an R-11 insulation value is 58 square feet.

In addition to coverage and dustiness, Gould also indicated that customers had complained of excess "shot" in his company's product. Shot are tiny pieces of material which do not fiberize (turn into fiber during the production process), but instead come through the production process in the form of tiny pellets. Shot is not a desirable waste product to have in rockwool insulation because it provides no insulation value.

These quality problems hurt American Rockwool in the market place.[5]

A. *Manufactured Housing*

From start-up until roughly September of 1980, the company made no sales to manufactured housing producers. (Although loosefill insulation has been used for many years to insulate the ceilings of site-built housing, until roughly 1979 loosefill rockwool generally was not marketed to manufactured housing producers.) In the early fall of 1980, Spring Hope hired Ronald Hepler, a former salesman with Owens-Corning and Rockwool Industries. Hepler had been responsible for manufactured housing accounts at both Owens-Corning and Rockwool Industries, and had helped Rockwool Industries make its first loosefill

5. These quality problems continued to plague the company for at least another four years. In 1983, in an attempt to improve the efficiency and operation of his plants, Gould hired a re-

tired executive from United States Gypsum, a competing manufacturer of rockwool, to serve as a consultant.

sales to manufactured housing customers. In November, 1980, with Hepler's assistance, Spring Hope made its first sale to a manufactured housing account, Brigadier Industries. Brigadier obtained approval from its design approval agency (DAPIA) to install Rockwool loosefill in the ceilings of its manufactured homes, leased a blowing wool machine from Spring Hope, and began purchasing rockwool loosefill manufactured at the Spring Hope facility.

Spring Hope developed marketing plans which identified potential manufactured housing accounts in the southeastern United States and assigned territory salesmen to develop these accounts. Although continuing to call on insulation contractors and to sell its product into that market, sales representatives of American Rockwool began to market the company's loosefill products to manufactured housing producers. From November 1980 up to May 31, 1981, the company met with success in its selling efforts. During that time, it installed blowing machines and began selling its loosefill product to the following manufactured housing producers:

| Customer | Location | Date Machine In |
|---|---|---|
| Brigadier | Nashville, NC | 11/18/80 |
| Brigadier (Knox) | Spring Hope, NC | 12/3/80 |
| Wick (Marshfield) | Henderson, NC | 12/3/80 |
| Vintage | Gainesville, GA | 2/2/81 |
| Trinity | Siler City, NC | 3/19/81 |
| All American | Ashburn, GA | 4/6/81 |
| All American (Family Housing) | Ashburn, GA | 4/28/81 |
| All American (Heritage Housing) | Pearson, GA | 5/4/81 |
| Sumney | Dallas, NC | 5/4/81 |
| All American | Bear Creek, AL | 5/11/81 |
| All American | Bear Creek, AL | 5/11/81 |
| All American | Lake City, FL | 5/18/81 |

In response to efforts to market rockwool insulation, Owens-Corning engaged in a sales campaign wherein it questioned the suitability of rockwool loosefill as a product for use in mobile homes.[6] On August 27, 1979, Owens-Corning's Manufactured Housing Marketing Division ("MHMD") sent a memorandum to Owens-Corning's sales managers and manufactured housing salespersons informing them of alleged "limitations" of using rockwool loosefill to insulate mobile home ceilings. Among these alleged "limitations" were the "settling and shifting of the insulation ... as the home is transported over the highway, causing reduced thermal performance." At the time this memorandum was circulated, Owens-Corning had not performed any tests of possible settling and shifting of loosefill insulation installed in homes transported over the road.

By early 1980, MHMD had requested Owens-Corning's research and technical personnel in Granville, Ohio, to perform an analysis of the use of loosefill in manufactured home ceilings. MHMD's concern regarding competition from loosefill is reflected in a memo of February 8, 1980, from Eric Heaton of MHMD to Richard Bemis of the OCF Granville laboratories:

> The Manufactured Housing Divisions [sic] number one priority is the loose fill analysis. These type products represent a major threat to both our unusually high market share and our pricing stability. As it stands now, I find any delay unacceptable....
>
> My concern is even heightened with our recent rapid escalation in price which has increased the price spread between batts and these loose fill type products.

An issue MHMD asked Granville to investigate was the potential settling and shifting of loosefill insulation installed in homes transported over the road. A settling study was conducted by Owens-Corning and was performed by Larry Brand of OCF's Granville laboratories in the spring of 1980. In an experiment in which a mobile home insulated in part with Rockwool Industries' loosefill was transported 200 miles, Brand observed an average reduction in thickness of less than 15% for the rockwool loosefill after transportation.

The amount of settling observed by Brand could be compensated for by the addition of material at the outset. Owens-Corning's technical staff developed a computer model for projecting the amount of

---

**6.** In mid–1979, Rockwool Industries, a competitor of Spring Hope, had begun selling its rockwool loosefill to manufactured housing customers primarily on the west coast.

material that would have to be installed at the outset such that the desired R-value would be achieved after over-the-road transportation, if the amount of settling observed by Brand occurred. Based on its computer model, OCF determined that for rockwool loosefill, depending on the design R-value and the distance of transportation, from two to five percent (2–5%) more material would be required at the outset to insure that the design R-value was present after transportation. Brand concluded that properly installed loosefill, with a cushion to compensate for settling, "will produce the same thermal performance as properly installed batts," and that "[l]oose-fill products are viable insulations to consider for the mobile home attic market."

By June of 1980, Harry Gautsche, the head of MHMD, reported to Owens-Corning sales personnel that "[t]he general opinion of the results [of the settling study] is that definite [sic] settling occurs which must be a serious consideration before dropping batts."

As the next phase of their loosefill analysis, in the late summer of 1980, representatives of Owens-Corning visited two manufactured housing plants in California which had begun to install rockwool loosefill in the ceilings of their homes. (One plant was operated by Fuqua Industries and the other by Golden West Homes.) In reporting on this trip, Heaton again expressed concern about competition from rockwool loosefill:

> The urgency of the situation is real and demands our immediate close attention. The magnitude represents a real threat, not only to our share in the West Coast area, but possibly our National share position over the next several years. This major threat is to our batt business, not only in the ceilings, but also the floors of all manufactured homes.

Heaton reported that there appeared to be "no technical or mechanical reasons" for not blowing rockwool loosefill into mobile home ceilings. In October, 1980, Owens-Corning technical personnel made a subsequent visit to the Golden West and Fuqua plants to observe the installation of rockwool loosefill.

Based on Owens' examination of the two rockwool systems at Golden West and Fuqua, in January of 1981, Owens-Corning prepared a techno-economic analysis ("TEA") concerning the use of loosefill rockwool in manufactured housing. The TEA discussed generically the relative advantages and disadvantages of using fiberglass batts versus loosefill rockwool in manufactured homes. No particular manufacturer of rockwool was identified in this document which was published in the fall of 1982. This document reported the results of tests conducted by Owens-Corning of the settling of loosefill rockwool insulation in the ceilings of mobile homes during over-the-road transportation. The document also reported various observations made by technical representatives of Owens-Corning during a visit in the fall of 1980 to the two mobile home plants in California. The principal conclusions of the TEA were that, at the time of the OCF visit in September, 1980, Fuqua was installing substantially more loosefill material than recommended by the manufacturer (and thus not realizing anticipated economic savings) and Golden West was not controlling its operation sufficiently to insulate to the desired R–value. Owens-Corning attributed these problems "to the lack of in-depth training and support given by Rockwool Industrie[s]" to Fuqua and Golden West. The TEA also concluded that "[t]here exist no technical reasons why loosefill cannot be used to insulate mobile home ceilings." The TEA then provided a list of the alleged advantages and disadvantages of loosefill and batts for use in mobile home ceilings. For example, it listed as a disadvantage of loosefill the need to compensate for possible settling.

In the spring of 1981, Owens-Corning personnel became aware that Spring Hope was making sales calls on manufactured housing accounts in the Southeast and was meeting with some success. In response to this competition, Owens-Corning personnel formulated a strategy of questioning the

suitability of rockwool loosefill for use in manufactured housing. As a result, Spring Hope began to encounter difficulties with some of its manufactured housing customers and to have difficulty making new sales. Some of the company's existing customers began to question whether loosefill rockwool was suitable for use in manufactured housing. Sales personnel from Spring Hope responded to these customer inquiries and concerns.

On April 13, 1981, Heaton of OFC held a conference call with the OCF Southeast Regional Sales Manager, Walt Crotty, and the sales managers of Owens-Corning's Florida, Atlanta and Carolina branches to outline their competitive strategy. Sales personnel were to pick up all information about Spring Hope Rockwool.

On April 16, 1981, Heaton sent to the southeastern sales managers a copy of the summary pages from the January TEA, including the "material comparison." Conclusion No. 4 that rockwool loosefill *is* suitable for use in mobile home ceilings was deleted. This document was circulated in response to calls by American Rockwool personnel on manufactured housing producers located in the Southeast. In the following weeks, Owens-Corning salesmen gathered information on the Spring Hope product and made presentations to mobile home accounts based on the information provided by Heaton in the conference call and memorandum.

Based on reports from the field, on May 22, 1981, Heaton prepared an analysis of the Spring Hope competitive threat. In his analysis he noted Spring Hope's success in making a sale to Brigadier Industries, and expressed his concern that this represented "the proof statement that it [insulating manufactured home ceilings with rockwool loosefill] can be done."

In June of 1981, Ben Coe, Owens-Corning's National Sales Manager, expressed concern about the use of loosefill in manufactured housing and the possible loss of sales to Owens-Corning. Gautsche replied that he had set up a loosefill strategy meeting in the Southeast for later in the month;

that he was preparing a technical bulletin to meet this competitive situation; and that technical presentations were to be made to the Vintage and Brigadier accounts on June 25 and June 26 respectively.

The technical bulletin to which Gautsche referred was prepared by John Blank of Owens-Corning's technical services staff. This technical bulletin, dated June 15, 1981, which Blank condensed from the TEA and distributed to the sales force, states that batt insulation "is a more viable alternative for insulating mobile home ceiling[s]" than loosefill. Owens-Corning did not acknowledge a superior thermal performance of ceilings insulated with loosefill versus batts of comparable R-value. Blank generalized that "experience has shown that operators become confused as to whether they should blow 'inches' or 'bags.' ... [and] that manufacturers do not give the extra attention that is needed for the proper installation." He also stated that (1) using loosefill requires a "sizeable" capital investment in a blowing machine and spare parts; (2) installing loosefill "requires a high skill and knowledge level by the operator"; and (3) batt insulation "has a consistent R-value," and requires less quality control by the home producer than loosefill. Blank concluded by telling the OCF sales people that "[t]his information should be helpful to you and your customers when and if you are presented with questions on the use of [rockwool loosefill] in mobile homes."

On June 24, 1981, a loosefill strategy meeting for Owens-Corning's southeastern region was held in Atlanta, Georgia. Owens-Corning sales personnel met with Crotty, Heaton, and others to be instructed on Owens' corporate strategy for combatting the rockwool competition.

During this time, Owens-Corning was assembling what became known as the "hit team," whose mission was to make detailed technical presentations to manufactured housing producers in order to persuade them not to purchase rockwool loosefill. The "hit team" consisted of an Owens-Corning technical person who was primarily responsible for the technical presenta-

tion, Heaton or Gautsche from MHMD, and a branch representative and/or the local salesman responsible for the particular account. The "hit team" presentation, which was illustrated with slides or other visual aids and lasted for an hour to an hour and a half, was based on the Brand settling study and the TEA. The purpose of the presentation was to make the customer "know of [OCF's] conclusions ... where we found the process inappropriate." While the Brand study concluded that 2–5% additional material was needed, the "hit team" suggested to manufacturers, that 11% more material would be required to compensate for settling, resulting in a "substantial cost penalty." From the summer of 1981 at least until the summer of 1983, the "hit team" continued to present the experiences of Fuqua and Golden West as typical of what mobile home producers could expect if they bought rockwool loosefill. In its "hit team" presentations Owens-Corning also described the relative merits of loosefill and batts.

Two of the earliest "hit team" presentations were made by Blank and Heaton to Vintage and Brigadier, on June 25 and 26, 1981, following the Atlanta strategy session. Heaton followed up his meeting with Vintage with a letter to purchasing agent Bill Carney in which Heaton made various statements about rockwool loosefill.

On July 7, 1981, Gautsche directed Crotty "to communicate the loosefill threat to mobile homes in the Southeast Region." He instructed Crotty that sales personnel should determine if non-national accounts had been contacted by Spring Hope and, if so, inform them that "there is damaging evidence and high risk" to using rockwool, and offer to present this information. Certain national account customers were not to be contacted at that time. Other customers were identified as " 'target customer home offices' that should be contacted and presented technical information...." These "targets" included Brigadier, Wick, Horton, Oakwood, Homes of Merit, Nobility and Peachtree.

On July 13, 1981, Crotty made recommendations to Gautsche on loosefill strategy. Although he viewed the loosefill threat as a regional problem centered around the Spring Hope location, Crotty suggested that the company approach it on a "national level" to be more effective. Specifically, he suggested that if the company took the approach that these technical presentations were for the good of the industry, rather than a competitive response to a particular company, the presentations might be more persuasive and effective. In coaching his branch sales managers on responding to loosefill competition, Crotty directed them to emphasize with customers that "settling and shifting ... make desired in-place R-value performance extremely doubtfu[l]."

On September 24, 1981, Gautsche informed OCF regional and branch managers of the arguments available to combat rockwool loosefill competition. In addition to the Technical Bulletin, the Hit Team, and the TEA, Gautsche identified the Brand settling study, which Gautsche stated revealed "the serious problem of over-the-road movement of rockwool in mobile home ceilings." He also stated that installing rockwool loosefill rather than batts in mobile home ceilings would "dramatically" aggravate potential ceiling sag. Finally, Gautsche stated he had test data which "raise[d] suspicion of advertised coverage and resulting R-values" of Spring Hope rockwool.

Thus, upon learning in March or April of 1981 that Spring Hope had begun marketing its product to mobile home accounts in the Southeast, Owens-Corning immediately began making technical presentations to customers, convened a meeting of its sales personnel located in the Southeast to instruct them on handling this competitive threat, and assembled a "hit team" to call on key customers to prevent loosefill rockwool from establishing itself in the manufactured housing market place. Presentations were made to accounts who were not Owens-Corning's accounts, such as Brigadier, allegedly because of Owens' concern that acceptance by such national level man-

ufacturers as Brigadier would gain rockwool general acceptance in the marketplace.

American Rockwool contends that this alleged campaign directed at rockwool loosefill competition has continued. In addition to the Hit Team presentations, Owens-Corning's statements about rockwool loosefill allegedly have been packaged in various new forms, such as letters to customers and a formal publication of the contents of the hit team presentation (the "White Paper").

### B. *Site-Built Housing: Casa Grande Rockwool Batts*

In November of 1982, Mr. Gould leased a rockwool manufacturing facility located in Casa Grande, Arizona, established a company known as Casa Grande Rockwool, Inc., and began operating the company in conjunction with his operations in Spring Hope, North Carolina. At the Arizona facility, the company manufactured both loosefill and batt rockwool products. At the time Gould leased the facility, it was owned and operated by the Del Webb Company primarily to furnish insulation products to the company's many construction projects in the Arizona area.

After taking over the plant, Mr. Gould determined that certain improvements in the Casa Grande operation were needed. The plant was utilizing a four-wheel spin, a fiberization process which has operational problems not found with horizontal spinning. Accordingly, the line was rebuilt and a horizontal spinning system was installed. In addition, other changes were made in plant operations which resulted in an improved batt product. The company also enhanced its marketing efforts with insulation contractors and expanded sales of loosefill products to manufactured housing producers in the area. In particular, the company increased efforts to sell rockwool batt products to insulation contractors. As a result, American Rockwool's sales of batt products to insulation contractors substantially increased from November of 1982 (the first month of sales) to April, 1983.

Owens-Corning sales representatives recognized the competitive pressure from Casa Grande. Because rockwool products are generally priced below fiberglass insulation products, Owens-Corning's Phoenix sales representative Elizabeth Ditmars became concerned about the loss of sales to Casa Grande. She recommended to her superiors that Owens-Corning test the thermal performance of the Casa Grande batts and, if the products should perform poorly, call that to the attention of customers in the hope of eliminating competition from Casa Grande. With the consent of her superiors, she obtained samples of Casa Grande R–11, R–13, R–19 and R–30 products and shipped them to Owens-Corning's Granville, Ohio, testing laboratory. Neither Ms. Ditmars nor the Owens-Corning testing personnel have been able to identify exactly when the samples for this series of tests were collected.

In late April or early May, representatives of American Rockwool learned that Owens-Corning planned to circulate a letter discouraging the use of American Rockwool batt products. The company unsuccessfully attempted to contact Owens-Corning representatives to determine the nature of the alleged deficiency in American Rockwool products and to obtain any underlying test results. On May 6, 1983, Owens-Corning mailed a letter at issue here to approximately 60 insulation contractors, approximately 25 building inspectors, state and other government officials, and about 45 builders and general contractors. The letter, which was mailed directly by Owens-Corning to persons located in Arizona, Utah, Nevada, New Mexico and Texas, represented to customers that a purchaser of Casa Grande batts "is not getting the R-value he is paying fo[r]" and that contractors who install Casa Grande batts "can be liable for up to $10,000 fine every time the product is installed."

After the publication of the letter, Casa Grande batt sales became flat and the rapid increase in the sales over the past six months ceased. The letter was circulated beyond the five-state area into which it originally was sent by Owens-Corning.

The May 6, 1983, letter was picked up in the field by other competitors of American Rockwool, such as Rockwool Industries, and it was utilized by them with its customers. In fact, Rockwool Industries circulated a letter to its sales representatives nationwide.

Insulation contractors do not have thermal testing facilities and generally view Owens-Corning as being technically proficient and reliable. Customers regard Owens-Corning as the technical leader in the insulation industry (a reputation which Owens cultivates), making it difficult for a small company like American Rockwool to counter adverse comments about its products.

### C. Growth of American Rockwool, Inc. During Relevant Time Period

In 1984, Gould broke ground for a third plant in Texas. The new plant in Texas will be similar to the Spring Hope plant, except that its production system will be different from the type presently in use at Spring Hope and Casa Grande. Gould testified that he made the decision to build a third plant in Texas as a result of his decision to focus the sales of the company on manufactured housing customers.

Thus, since the opening of the Spring Hope plant in July, 1978, American Rockwool has added two additional plants, one in Arizona, and one in Texas that is scheduled to go into operation in early 1986. According to Gould, all three plants have roughly the same capacity. Ironically, the increase in value of American Rockwool and its expansion from one plant to three has occurred during the same time frame (August 1981 to December 31, 1985) in which American Rockwool alleges that it was damaged by Owens-Corning.

In addition to tripling its production capacity by adding two additional plants over the past four years, American Rockwool also increased its sales dramatically. American Rockwool's gross sales from its Spring Hope and Casa Grande plants have increased by over 370% between 1980 and 1984. Compared to other suppliers in the marketplace, American Rockwool's performance is phenomenal. For example, during the same period, Gould's former employer Rockwool Industries (Susquehanna) enjoyed a 23.3% increase in sales while Owens-Corning's sales of insulation products increased by 19.6%. As for the demand for insulation products during this time period, manufactured housing units increased by 33.3% and permits for conventional housing increased 39.8%. Thus, American Rockwool's gain in market share during the period under consideration has rapidly increased.

### III. ANALYSIS

We begin our random walk through the North Carolina Statutes, and the common law causes of action upon which plaintiff predicates its claims with the discussion of the legal applicability of the North Carolina General Statutes to the operative facts. Initially, the court notes that the operative facts which form the predicate for plaintiff's North Carolina statutory claims, as well as its common law claims, are those of defendant's alleged disparagement of plaintiff's product—rockwool loosefill insulation.[7] We turn first to the application of N.C.GEN.STAT. § 75–1.1.

### A. North Carolina General Statute § 75–1.1

#### 1. Extra-territorial Application

While it is true as a general matter that North Carolina law—whether statutory or resulting from judicial interpretation—does not apply to conduct occurring outside of North Carolina, under some circumstances conduct occurring outside of the state will

---

7. Plaintiff does not contend that § 75–1.1 or any other North Carolina law applies to the "site built housing" portion of the case, which is based on conduct directed toward insulation contractors in the Western United States at a time when Casa Grande Rockwool was an Arizona corporation. Plaintiff's case in that regard is predicated upon the Lanham Act, and the common law of disparagement and unfair competition. Hence the court's discussion of the applicability of the North Carolina General statutes to plaintiff's cause of action is pertinent only to the "manufactured housing" portion of the case.

be governed by North Carolina law if it is clear that such law so intends and that the application thereof is constitutionally permissible. Of course, no North Carolina statute which by its own terms is limited to in-state conduct can be applied to conduct occurring outside the state. Section 75–1.-1, however, is not so limited. Indeed, before 1977, § 75–1.1 was specifically limited to dealings between persons "within this state." In 1977, however, the Legislature amended the statute and deleted this geographic limitation. In re-writing § 75–1.1, the General Assembly expanded an effective cause of action for individuals and businesses in North Carolina who have been victimized by unscrupulous methods of competition or trade practices. The court perceives that the General Assembly intended to hold parties causing injury in North Carolina accountable in the courts of this state, insofar as possible. *See* N.C. GEN.STAT. § 1–75.4(4) (providing jurisdiction over foreign acts that cause local injury.) By enacting § 1–75.4(4), "it is apparent that the General Assembly intended to make available to the North Carolina court the full jurisdictional powers permissible under federal due process." *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977). By deleting the geographic limitation from § 75–1.-1, the General Assembly made this statute available to the full extent permissible under conflicts of law principles and the Constitution. Such intent being evident, it is necessary to determine whether the effectuation of such intent is prohibited by constitutional proscriptions.

At the outset, it is recognized that for North Carolina's substantive law to be applied in a constitutionally permissible manner to the instant litigation, North Carolina must have a significant contact or significant aggregation of contacts, creating state interests, such that the application of North Carolina's law is neither arbitrary nor fundamentally unfair. *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 312–13, 101 S.Ct. 633, 639–40, 633 L.Ed.2d 521 (1981) (opinion of Brennan, J.). In the instant case, the operative facts have suffi-

cient contact to North Carolina, the forum state, to justify the application of its law. American Rockwool is a North Carolina resident (as was its predecessor Spring Hope) incorporated and maintaining its principal place of business in North Carolina. North Carolina has a proper interest in protecting North Carolina based businesses from what it perceives to be unfair tactics of competitors, not only because such businesses are residents of the state, but also because they contribute substantially to the state's tax base and to the employment of its citizens. Moreover, Owens-Corning has been present doing business in North Carolina. In the words of the plurality in *Allstate:*

> By virtue of its presence, [the defendant] can hardly claim unfamiliarity with the laws of the host jurisdiction and surprise that the state courts might apply forum law to litigation in which the company is involved.

449 U.S. at 317, 101 S.Ct. at 642. In addition, defendant's alleged disparagement of rockwool loosefill as used in manufactured housing, the course of conduct giving rise to the North Carolina statutory and common law claims, was carried out in substantial part in North Carolina. Thus, the application of North Carolina law to all manufactured housing conduct has a rational foundation.

Just as there is a rational basis for the application of North Carolina law, there is no rational basis for precluding its application. The operative facts which are the predicate for plaintiff's various state causes of action are the defendant's alleged disparagement of plaintiff's product. The parties concede that the common law cause of action for disparagement is generally recognized by all fifty states, and there is no suggestion that such cause of action is not recognized by the various states in which the defendant's conduct occurred. That being true, persons in all states would be on notice of the unlawfulness of such disparagement, and it does not deny due process to any such person to apply to him a cause of action within North Carolina

predicated upon such conduct. Similarly, the application of a North Carolina remedy commonly applied in all jurisdictions to such conduct, does not impinge upon, contravene or do violence to the sovereignty of any other state. Simply put, to allow North Carolina to remedy concerted multi-state disparagement of the product of one of its citizens does not do violence per se to the due process or full faith and credit clauses of the United States Constitution.

■ As to the proscriptions of the commerce clause, the court notes that while it is true that state statutes may not impose an undue burden on interstate commerce, as the Fourth Circuit has stated, "not every exercise of state power with some impact on interstate commerce is invalid." *Itco Corp. v. Michelin Tire Corp., Commercial Div.,* 722 F.2d 42, 48 n. 9 (4th Cir.1983), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985) (citation omitted). As the court recognized in *Itco,* only where the burden imposed on interstate commerce is excessive in relation to the local interests served by the state will the commerce clause be offended. *Id.* In holding that the application of § 75–1.1 to the defendant's multi-state conduct did not offend the commerce clause, the *Itco* court stated:

> Absent some reason to believe that the North Carolina act is an attempt directly to regulate interstate commerce, and is not an act designed to address primarily local concerns which happen to have an occasional incidental, but not excessive, effect upon interstate commerce, we perceive no cause for constitutional concern.

*Id.*

■ Section 75–1.1 is designed, in part, to address the very real local concern that North Carolina businesses not be victimized by unfair methods of competition. When applied to concerted multi-state conduct resulting in injury to North Carolina residents, the statute may have an incidental interstate effect, but that effect certainly is not excessive in light of the local interests served and its minimal burden upon other states which recognize the com-

mon law action for disparagement as applicable to the operative facts alleged by the plaintiff. Any time a single state's law is applied to multi-state conduct, there is *some* effect on interstate commerce in the broadest sense, but that effect rarely burdens interstate commerce to a constitutionally impermissible extent. In the instant case, § 75–1.1 only incidentally affects interstate commerce while serving substantial local interests. Plaintiff's cause of action for disparagement being recognized in the various states, to allow North Carolina to remedy the same does not result in any undue or additional burden upon interstate commerce. The statute, therefore, does not run afoul of the commerce clause.

### 2. Preemption

At the summary judgment motions hearing held on January 9–10, 1986, the court raised for the first time the question of whether or not the application of N.C.Gen. Stat. §§ 75–1.1 and 75–5(b)(3) to conduct occurring outside of North Carolina was preempted by federal statute. After reviewing those portions of the parties' supplemental memoranda which address this question, the court is of the opinion that neither statute is so preempted.

■ It generally is assumed that federal antitrust laws are not intended to preempt the field; therefore, a state may forbid conduct with a "baby Sherman Act" that federal antitrust law would also forbid. P. Areeda, *Antitrust Analysis* ¶ 181 (3d ed. 1981). Furthermore, a state may condemn conduct that would be held lawful under the Sherman Act; "the fact that the Sherman Act tolerates certain conduct does not necessarily mean that there is an affirmative federal policy encouraging such conduct." *Id.*

The Fourth Circuit in fact has held that the federal antitrust laws do not preempt the states from regulating unfair business practices. *Itco Corp.,* 722 F.2d at 48 n. 9; *Bostic Oil Co. v. Michelin Tire Corp.,* 702 F.2d 1207, 1219 (4th Cir.), *cert. denied,* 464 U.S. 894, 104 S.Ct. 242, 78 L.Ed.2d 232

(1983). As the court stated in *Itco*, "[w]e ... reject ... [the] contention that the federal antitrust laws occupy the field and that North Carolina is therefore preempted from making conduct that offends § 1 of the Sherman Act violative of its own laws as well." 722 F.2d at 48 n. 9. The court went on to reject the suggestion that state regulation of unfair trade practices that touch upon interstate commerce is rendered unconstitutional by the negative implications that flow from the Commerce Clause. *Id.*

■ Federal courts, when exercising their diversity jurisdiction over state law claims, as the court must in the case at bar, must apply the choice of law rules applicable in the forum state. This court therefore is bound to look to the choice of law rules applicable in North Carolina's state courts. See this court's discussion of the choice of law question, *infra.* While state laws often will apply to wholly intrastate conduct, there are many situations, such as the present one, in which choice-of-law rules will dictate that a particular state's trade regulation laws be applied to conduct occurring outside of the state. *Id.* Although the preemption doctrine does not operate to preclude the application of a state's anti-trust laws to interstate conduct, a state's application of its own law must comport with the United States Constitution which requires that the application of a given state's law not be unfair to the parties in contravention of the due process clause, not infringe upon other states' sovereignty in violation of the full faith and credit clause, and not unduly burden interstate commerce in violation of the commerce clause. As discussed previously, the application of the North Carolina statutes to the conduct at issue are not violative of the United States Constitution in any of these respects. In sum, there may be limits on a state's ability to apply its antitrust laws to out-of-state conduct, but the preemptive effect of the federal antitrust laws is not such a limit.

### 3. Choice of Law

■ Since § 75–1.1 is intended to apply to extra-territorial conduct where such application is not constitutionally prohibited, and the court having found no constitutional proscription of the application of such statute in the instant case, the next issue to be resolved is whether or not North Carolina would apply 75–1.1 in the instant litigation. In a diversity action such as this, in federal court in North Carolina, the court must apply the choice of law rules of the North Carolina State Courts. *Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Santana, Inc. v. Levi Strauss & Co.*, 674 F.2d 269 (4th Cir.1982). As the Fourth Circuit Court of Appeals has observed, "[i]n personal injury and wrongful death cases, North Carolina courts have unequivocally adhered to the *lex loci delicti* rule." *Santana*, 674 F.2d at 272. Under this rule, the courts apply the law of the place of injury. *Id.*[8] In *Santana*, the

---

8. Where plaintiff's injury occurred, in a legal sense, is not at all self-evident. On the one hand, defendant's alleged conduct caused plaintiff to lose the business of customers in many different states. On the other hand, all those lost sales injured plaintiff at its place of business in North Carolina, where it experienced reduced profits. Courts disagree as to whether injury occurs where business is lost or at the plaintiff's business where profits are lost. *Compare American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 435 (2d Cir.1971) (injury occurs where business lost) with *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 19 (1st Cir.1979), *cert. denied*, 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980);

449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980) ("the place of injury is where plaintiff suffered the harm, *i.e.*, at its place of business....").

The North Carolina law of where injury occurs for choice of law purposes is unclear. In applying *lex loci* in *Santana*, the Fourth Circuit concluded that the Missouri plaintiff's injury had occurred in California where the defendant's last act of misconduct had taken place. 674 F.2d at 273. More recently, however, in applying the North Carolina *lex loci* rule, the Fourth Circuit has stated

Manifestly, the injuries sustained by [plaintiff], a North Carolina corporation with its

Fourth Circuit went on to note that "the North Carolina Supreme Court has never had the opportunity to address the question of what law applies in *multi-state misrepresentation or unfair trade practices cases.*" *Id.* (Emphasis added.) The court then expressed the opinion that in such a case the North Carolina Supreme Court might abandon the *lex loci* rule in favor of the more flexible "most significant relationship" test. *Id., citing Lowe's North Wilksboro Hardware, Inc. v. Fidelity Mutual Life Ins. Co.,* 319 F.2d 469 (4th Cir.1963) (in which the Fourth Circuit held that North Carolina would apply the "most significant relationship" test to a case involving allegations of negligent delay in acting upon an application for life insurance *in a multistate setting*).

As the Fourth Circuit explained in *Santana,* "[t]he 'most significant relationship test' requires the court to examine various factors to determine which state has the most significant relationship to the occurrence giving rise to the suit." 674 F.2d at 272, *see also Restatement (Second) of Conflict of Laws* § 145 (1971). The *Santana* court, however, decided that it need not choose between the *lex loci* and "most significant relationship" rules because it would reach the same result under either. 674 F.2d at 272–74.

Since the Fourth Circuit's decision in *Santana,* the North Carolina Court of Appeals has made three choice of law rulings in cases involving claims under § 75–1.1. In the first, apparently applying the *lex loci* rule, the court held that Virginia rather than North Carolina law governed the conduct alleged. *Lloyd v. Carnation Co.,* 61 N.C.App. 381, 388, 301 S.E.2d 414, 418 (1983). In *Lloyd,* however, the court did not consider whether the "most significant relationship" test, rather than *lex loci,*

should apply to § 75–1.1 and other types of commercial tort cases. Even if the court had applied a "most significant relationship" test, it seems Virginia law would continue to govern the conduct, as the disputed acts took place entirely in Virginia. *Id.*

In a subsequent case, the Court of Appeals applied the "most significant relationship" test to a suit for fraud and unfair trade practices. *Michael v. Greene,* 63 N.C.App. 713, 306 S.E.2d 144 (1983). Again the court did not discuss which choice of law rule governed this type of case, although it did cite the Fourth Circuit's opinions in *Lowe's* and *Santana* in which that court explained that a more flexible approach than *lex loci* was appropriate in actions other than for personal injury.

Most recently, the Court of Appeals has made explicit what was implicit in *Michael v. Greene.* In *Andrew Jackson Sales v. Bi-Lo Stores, Inc.,* 68 N.C.App. 222, 314 S.E.2d 797 (1984), a suit for unfair and deceptive trade practices in a multistate area, the court stated:

> The traditional choice of law rule employed by our courts in deciding actions in tort is *lex loci delicti,* determined in turn by the place where the injury occurs. In actions involving unfair or deceptive trade practices, however, our courts have not followed this traditional rule, but have instead applied the law of the state having the most significant relationship to the occurrence giving rise to the action.

68 N.C.App. at 224–25, 314 S.E.2d at 799 (citations omitted). Thus, this court assumes that the North Carolina courts would apply the "most significant relation-

---

principal place of business in North Carolina, were sustained in the state of North Carolina. *Itco Corp.,* 722 F.2d at 49–50 n. 11 (citation omitted). Moreover, in applying the North Carolina long-arm statute, N.C.Gen.Stat. § 1–75.-4(4), which applies to conduct occurring outside the state that causes injury in the state, federal courts have held that multistate tortious conduct injures a plaintiff at its principal place of

business where it loses profits. *See Fishay Intertechnology, Inc. v. Delta International Corp.,* 696 F.2d 1062, 1067–68 (4th Cir.1982); *Munchak Corp. v. Riko Enterprises, Inc.,* 368 F.Supp. 1366, 1371 (M.D.N.C.1973). Although, as herein found, *lex loci* does not govern this case, the place of plaintiff's injury is nonetheless relevant to the choice of law. *See* Restatement (Second) of Conflict of Laws § 145(2)(a).

ship" test in determining which state's law to apply to this case.[9]

■ In order to apply the "most significant relationship" test, the court must first identify the occurrences giving rise to this suit. As set forth in the recited facts, two discrete series of occurrences give rise to plaintiff's claims: (1) Owens-Corning's campaign to persuade manufactured home producers not to use rockwool loosefill, which consisted of presentations and the dissemination of literature to the manufactured home customers; and (2) Owens-Corning's publication of the May 6, 1983, letter to insulation contractors and builders. These are distinct "occurrences" for choice of law purposes, calling for a separate application of the "most significant relationship" test to each. The two courses of conduct involved different rockwool products (loosefill and batts), produced by different corporations (Spring Hope/American, a North Carolina corporation with its principal place of business in North Carolina, and Casa Grande, an Arizona corporation with its principal place of business in Arizona); moreover, the form and substance of plaintiff's claims regarding Owens-Corning's alleged disparagement and unfair competition in the two cases was distinct, implemented by different marketing divisions within Owens-Corning, and aimed at different groups of customers. Indeed, the allegations of these two courses of conduct were originally raised in two separate lawsuits.

Having established that the manufactured housing conduct and the site-built housing conduct should be treated separately for choice of law purposes, the next question is whether all of Owens-Corning's alleged conduct in each portion of the case, though carried out in, or directed to, multiple states, should be treated as a single "occurrence" governed by one state's law. With respect to the site-built housing conduct—the publication of the May 6, 1983, letter—the court holds that Arizona law is applicable thereto for the following reasons.

Although the publication of the May 6, 1983, letter gives rise to liability under several common law theories, it was an "aggregate communication [allegedly] involving injurious falsehood ... published to third persons in two or more states...." *Restatement (Second) of Conflicts of Laws* § 151 comment c (1971). Under such circumstances,

> the plaintiff has but one cause of action for choice-of-law purposes and [the courts] will apply the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties. The applicable law will usually be the local law of the state where the interest affected has its principal location if the matter complained of was published to a third person in that state. So, *if the aggregate communication disparages, or otherwise causes pecuniary loss to, the plaintiff's trade or business, the applicable law will usually be the local law of the state where the plaintiff has his principal place of business.*

*Id.* (emphasis added); *see also Id.* at § 150 comment e. The rationale for this "aggregate communication" rule is explained in the comment to § 150 of the *Restatement,* which governs defamation rather than injurious falsehood or disparagement, but which is incorporated by reference into the comment to § 151. As the reporter explains, without such a rule

> the forum might be required to consult and apply the local law of every state in

---

**9.** In a footnote in *Itco Corp.,* 722 F.2d at 49–50 n. 11, the Fourth Circuit Court of Appeals followed *Lloyd v. Carnation Co.* in applying *lex loci* to an unfair trade practices claim. Apparently, at the time of its decision in *Itco* the court was not yet aware of the North Carolina Court of Appeals' decision two months previously in *Michael v. Greene; Andrew Jackson* had not yet been decided. No reference was made to the Fourth Circuit's lengthy discussion in *Santana* of the possible application by the North Carolina Supreme Court of a "most significant relationship test" in the unfair trade practices context. Given the North Carolina Court of Appeals' abandonment of the *lex loci* rule applied in *Lloyd,* the *Itco* footnote would not appear to be controlling.

which there was publication of the defamatory matter. This would mean in the case of a nationwide broadcast or of a publication of nationwide circulation that the forum would, at the least, have to consult and apply the local law of fifty States and of the District of Columbia. *Id.* at § 150 comment c at 457. The comment goes on to say that

A plaintiff, who has a right of action under the local law of the state selected by application of the rule of this Section, will recover for the entire injury the communication has caused, or may be expected to cause, him in all states in which the communication is published. This is true even if the communication is published in one or more states under whose local law the plaintiff has no right of action.

*Id.*

■ Applying these principles to defendant's site-built housing conduct, it is clear that Arizona law should govern the publication of the May 6 letter. At the time of the publication, Casa Grande Rockwool was an Arizona corporation with its principal place of business in Arizona. At all times relevant herein, defendant has had offices in Arizona and has done a substantial volume of business there. Casa Grande and Owens-Corning competed principally for the business of Arizona-based insulation contractors and it was to those customers that the letter primarily was distributed. Thus, Arizona law governs the site-built housing portion of the case.

■ The court reaches a contrary result as to the manufactured housing portion of the case. Defendant's alleged disparagement of plaintiff's rockwool loosefill product and system to the manufactured housing customers took several forms: (1) the publication of the "white paper" on the use of loosefill insulation in manufactured home ceilings; (2) the hit team presentations to manufactured home producers; and (3) less formal presentations and letters to customers in which the alleged disadvantages of loosefill were discussed.

■ Although the alleged manufactured housing disparagement involved more than a simple aggregate communication, all of the conduct complained of was part of a single campaign by Owens-Corning. The campaign was implemented by MHMD and involved the presentation of the same information about loosefill to various customers on multiple occasions. The policy considerations that underlie the "aggregate communication" rule are thus fully present here. Where a defendant has gone from customer to customer disparaging a plaintiff's product, the state of plaintiff's principal place of business has just as strong an interest in remedying the plaintiff's injury, and an inquiry into the laws of dozens of states is just as undesirable, as where the defendant has made a mass mailing of a single disparaging letter.

To sever defendant's manufactured housing disparagement into a dozen or more different claims for relief, governed by the law of as many different states, would create an unnecessary nightmare of judicial administration. As one leading commentator has explained

to permit ... diverse results when publication has been made and has caused harm in literally dozens of jurisdictions would produce an unintelligible babble of rules if an attempt were made to try all of the resulting transitory causes of action in one suit, or cause multiple litigation at much cost to the parties and harassment of the defendant. For these reasons, it may be desirable to select some one jurisdiction, such as the plaintiff's domicile, or, if the plaintiff has suffered most of his harm in some other jurisdiction, that jurisdiction, to provide rules to govern liability for the damage done everywhere. This may be desirable for reasons of economy of judicial administration when, otherwise, the result might be justly criticized for incorrectly resolving a spurious conflict.

R. Weintraub, *Commentary on the Conflicts of Law*, § 6.30 at 342–43 (2d Ed.1980) (footnotes omitted). Another commentator has reached a similar conclusion in the unfair competition context:

In the frequent cases where there have been substantial concurrent impacts in many, and sometimes all, states, it seems a counsel of perfection to ask a harried judge to examine minutely the law of each state and to instruct the jury to assess separate damages for the loss that occurred in each state where a cause of action would exist.... Investigation of the laws of other states may require laborious examination of expert witnesses and scrutiny of foreign statutes and decisions.... Therefore, where a substantial number of impacts have occurred within the forum, and where it is also the main place of business of either the plaintiff or the defendant, its law should govern.

Note, "The Choice of law in Multistate Unfair Competition: A Legal-Industrial Enigma," 60 Harv.L.Rev. 1315, 1319–1320 (1947) (footnotes omitted).

The court is unaware of any North Carolina cases directly discussing this issue. In *Andrew Jackson Sales v. Bi-Lo Stores, Inc.*, 68 N.C.App. 222, 314 S.E.2d 797 (1984), however, the North Carolina Court of Appeals applied one state's law—South Carolina's—to a suit in which the defendant allegedly had committed unfair trade practices, by refusing to accept plaintiff's goods, in several states. Thus, the only North Carolina court faced with the issue rejected the inefficient and unhappy prospect of applying several state's laws to multi-state unfair trade practices.

Few cases from other jurisdictions on point have been found. Perhaps the case involving facts closest to those here is *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131 (3rd Cir.1977). There the plaintiffs, manufacturers of instant lottery tickets for use in state lotteries, sued a competitor for disparaging the quality of lottery tickets produced by plaintiffs. The alleged disparagement occurred in various and separate communications by defendant to lottery officials of six different states. *Id.* at 1135. Plaintiffs sought damages for defendant's past disparagement and an injunction against further disparagement in any state in which plaintiffs and defendant might compete for future lottery contracts.

On appeal from the district court's entry of a preliminary injunction, the Third Circuit Court of Appeals concluded that a New Jersey court would apply New Jersey law to plaintiff's entire claim for injunctive relief. *Id.* at 1138–39. The court first concluded that, for reasons of convenience, uniformity, and predictability, New Jersey courts would apply a single state's law to all prospective disparagement, regardless of the state in which it might occur. *Id.* The court then concluded that "a New Jersey court would probably, and reasonably, choose New Jersey as the single state whose law should appl[y]" *because both plaintiff corporations maintained their principal places of business in New Jersey and New Jersey was one of the states in which the disparaging communications were published. Id.* at 1139 (emphasis added). While the court did not decide "what law should be applied to the instant action for damages resulting from disparagement which was allegedly published in the pas[t,]" it did observe, for the benefit of the district court on remand, that "compelling considerations of convenience may indicate that New Jersey law, or the law of some other *single state*, should control." *Id.* at n. 7 (emphasis added).

■ This court thus believes that the North Carolina courts would apply North Carolina law to a multistate disparagement campaign which (1) was directed at a North Carolina corporation with its principal place of business here; (2) was carried out by a multinational corporation with offices in North Carolina and doing extensive business here; and (3) included widespread disparagement of plaintiff in North Carolina. This result is consistent with the state's goal of providing a remedy in North Carolina for persons injured by conduct occurring outside the state but causing injury here. *See* N.C.Gen.Stat. 1–75.4(4). By avoiding an inquiry into the law of many different states, such a rule also serves the

state's goals of uniformity and the efficient administration of justice.

### 4. Necessity for Effect on Competition

Notwithstanding the foregoing, it is contended by defendant that § 75–1.1 is inapplicable inasmuch as its application requires that American Rockwool demonstrate (contrary to its ability to do so) an adverse effect upon overall competition in the relevant market. This contention is without merit for several reasons.

First, by its terms § 75–1.1 requires that the proscribed unfair methods of competition and unfair or deceptive acts or practices be "in or affecting commerce." Nothing in the statute requires an effect on competition. North Carolina courts have held that a number of commercial activities "affect commerce" within the statute's meaning, without the requirement of a showing of effect on competition. *See, e.g., Johnson v. Phoenix Mutual Life Insurance Co.*, 300 N.C. 247, 266 S.E.2d 610 (1980), *see also Ellis v. Smith-Broadhurst, Inc.*, 48 N.C.App. 180, 268 S.E.2d 271 (1980) (§ 75–1.1 is applicable to insurance agent's misrepresentations about competitor's policy without a showing that those misrepresentations affected competition in the relevant market.).

Second, § 75–1.1 is designed to protect competitors from unfair business practices. *See United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F.Supp. 1041, 1046, (E.D.N.C.1979) (purpose of § 75–1.1 is "directed toward maintaining ethical standards in dealings between persons engaged in business"); *Harrington Manufacturing Co. v. Powell Manu-facturing Co.*, 38 N.C.App. 393, 396, 248 S.E.2d 739, 741–42 (1978) (citation omitted), *cert. denied*, 296 N.C. 411, 251 S.E.2d 469 (1979) ("G.S. 75–1.1(b) speaks in terms of declaring and providing civil means of maintaining ethical standards of dealing "between persons engaged in business," as well as between such persons and the consuming public.").

▮ The protection of competitors cannot be equated, *a fortiori*, to the protection of competition, and no case has been found to such effect. It is true, of course, that under certain federal anti-trust statutes, plaintiff must show not only that it has been injured by a challenged practice, but also that competition in the relevant market has been injured. To prove an effect on competition in this sense, a plaintiff must put on expert economic testimony as to what the "relevant" product and geographic markets are, and whether the defendant's conduct had any competitive effect within that market. The federal statutes and the judicial interpretations thereof, however, are not applicable to the North Carolina statutes under discussion. Neither *Stearns v. Genrad, Inc.*, 564 F.Supp. 1309 (M.D.N.C.1983), *aff'd*, 752 F.2d 942 (4th Cir.1984), nor *Harrington Manufacturing Co. v. Powell Manufacturing Co.*, *supra*, compel a contrary conclusion. In *Stearns v. Genrad, Inc.*, the court concluded, without any discussion of the effect on competition, that defendant Genrad's conduct did not violate Sections 75–1, 75–5, or 75–1.1. Although the court stated that the plaintiff "has made absolutely no effort to demonstrate any effect upon overall competition in the relevant market," 564 F.Supp. at 1318, such statement was clearly dicta and not the predicate for the court's decision. On appeal, the Fourth Circuit made no mention of the effect on competition in the relevant market, the court concluding that the conduct of which the plaintiff had complained simply did not amount to an unfair or deceptive practice. The *Harrington* court did not consider the effect on competition in the market to be a relevant consideration, but simply indicated that unfair conduct should be judged "by determining its intended and actual effect on others," not on competition. 38 N.C. App. at 400, 248 S.E.2d at 744.

The court now turns to the legal issues arising from the language of N.C.GEN. STAT. § 75–5(b)(3)

### B. *North Carolina General Statute § 75–5(b)(3)*

For the purposes of this discussion, it is important to note the statutory language

of the relevant parts of § 75–5(b). In pertinent part, § 75–5(b)(3) provides:

(b) In addition to the other acts declared unlawful by this chapter, it is unlawful for any person directly or indirectly to do, or to have any contract express or knowingly implied to do, any of the following acts:

(3) to willfully destroy or injure, or undertake to destroy or injure, *the business* of any competitor or business rival *in this state* with the purpose of attempting to fix the price of any goods when the competition is removed. (emphasis added)

There are few decisions that discuss § 75–5(b)(3); those that do, involve conduct within the State of North Carolina, and provide no guidance with regard to its application to any extra-territorial conduct.

At the outset, it is noted that any act which is a violation of § 75–5(b)(3) would also be considered to be a violation of § 75–1.1, since § 75–5(b)(3) simply sets out specific conduct which is considered to be illegal and an unfair competitive act. Unlike the language of § 75–1.1, however, the statutory language of § 75–5(b)(3) explicitly delineates the conduct prohibited within the limitations of the statutory language.

As to § 75–5(b)(3), plaintiff contends that it applies to any conduct within or without the State of North Carolina which is undertaken to destroy the business of a *competitor* or *business rival in this state,* thus interpreting the limitation as applicable to a business entity geographically within North Carolina. The court disagrees with the plaintiff's construction. As the court perceives the statute, it makes unlawful the destruction or attempted destruction of *the business,* i.e., the commercial activity, within North Carolina of a competitor or business rival with the purpose of attempting to fix the price of goods when the competition is removed. In other words, it would be unlawful to attempt to destroy *the business* in North Carolina of a national concern, as well as a local concern unaffected by out of state conduct or without out of state contacts. It is the existence of the *business activity* of the competitor or business rival which is protected, for it is the absence of such business activity (or competition) which accrues to the detriment of consumers and purchasers within the state. This is not to say that § 75–5(b)(3) is limited to conduct occurring in North Carolina, for clearly conduct occurring outside of North Carolina could impact upon the business activity of a competitor (whether national or local) within the state.

As noted, the court perceives the thrust of § 75–5(b)(3) to be the protection of business activity within the state. The statutory language so interpreted does not preclude the application of the statute to extra-territorial conduct affecting in-state commercial activity. Nor is such application constitutionally prohibited. North Carolina has a proper interest in protecting such commercial activity, as the same affects state and local tax revenues (income, sales and property taxes), the employment of the state's citizens, and the benefits to them as purchasers and consumers arising by the preservation of competition, which is concomitant with the existence of such commercial activity. The application of the statute to extra-territorial conduct therefore has a rational predicate.

As in the case of product disparagement, the court perceives the willful destruction of the business of a competitor with the purpose of attempting to fix prices when competition is removed to be universally condemned and subject to legal remedy, so that the statute's application to extra-territorial conduct directed toward commercial activity in North Carolina does not fall within the proscriptions of the due process, full faith and credit and commerce clauses of the Constitution for the same reasons heretofore expressed concerning their applicability to § 75–1.1. In addition, for the same reasons previously discussed with respect to § 75–1.1, the application of § 75–5(b)(3) to conduct occurring outside of North Carolina is not preempted by federal statute.

■ Furthermore, the court does not construe the statute as requiring a showing of adverse impact upon competition in the relevant market. Such is not a requirement for § 75–5(b)(3), a statute designed to protect the North Carolina business of competitors, and consequently the interests of purchasers and consumers, from an unfair business practice. No case has been found holding that a § 75–5(b)(3) plaintiff must show an effect on competition in the federal sense. The court's previous discussion of this issue as it relates to § 75–1.1 is applicable here.

### C. North Carolina General Statute § 75–16

As heretofore indicated, the court does not perceive any constitutional prohibition against a private cause of action under § 75–1.1 or § 75–5(b)(3) to extra-territorial conduct of product disparagement directed respectively toward a North Carolina competitor or the business in North Carolina of a competitor, North Carolina having a rational interest in each situation and there being no constitutional prohibition thereof. The conjunctive application of either statute with the treble damages penalty provision of § 75–16 is, however, another question.

As to such conjunctive application, the party engaged in the extra-territorial disparagement of a product could not reasonably be expected to have notice of North Carolina's treble damages penalty statute. While many if not most states recognize common law disparagement (the persons therein being reasonably charged with notice thereof), there may be significant differences between the penalty to be imposed, if any, under the law of North Carolina and the laws of other states where such disparagement occurs. The penalty multiplier, if any, arises by reason of an arbitrary selection by the legislature of the forum state, and there could be as many different multipliers as there are states. The arbitrary nature of the amount of the multiplier and the arbitrary enactment of the imposition of such a penalty by the respective sovereigns makes it unreasonable to charge parties engaged in extra-territorial product disparagement with knowledge of each state's law. To charge a person with such knowledge "is not reasonable—in a due process sense—within the context of our federal system of government." *McCluney v. Jos. Schlitz Brewing Co.*, 649 F.2d 578, 580 (8th Cir.1981). In short, there may be substantial differences in the penalties available in the form of multiplied damages to plaintiffs under the different state laws potentially applicable. The application of North Carolina's treble damage penalty to extra-territorial conduct would result in conduct in sister states being subject to sanctions never approved or adopted by those states.

■ In summation, Owens-Corning had no reason to expect that it was subject to the treble damage penalty or sanction of North Carolina law for statements about rockwool made outside the borders of North Carolina by an Ohio company (Owens-Corning) to citizens of numerous states other than North Carolina, in competition with rockwool manufacturers from a variety of states other than North Carolina. The application of North Carolina's treble damage penalty simply does not comport with due process notice requirements.

The court now turns to the proscriptions of the commerce clause of the Constitution as applied to the conjunctive application of the treble damage penalty of § 75–16 to extra-territorial product disparagement.

■ It is a fundamental principle of our federal system that, under the commerce clause of the Constitution, U.S. Const. art. I, § 8, the regulation of interstate commerce is reserved solely for the federal government. *See, e.g., South Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984); *Edgar v. Mite Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Applying this principle, the Fourth Circuit has recently held that:

the test for the constitutionality of a state statute which is challenged under the commerce clause is as follows:

'Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effect on interstate commerce is only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the punitive local benefits.' *Baltimore Gas & Electric Co. v. Heintz,* 760 F.2d 1408, 1422 (4th Cir.1985) (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). Thus, while a state may, in order to achieve a legitimate local purpose, regulate business transactions occurring within the state even if those transactions have some connection with interstate commerce, the effects on interstate commerce must be only "incidental to achieving that local purpose." *Id.* If, however, "the purpose of effect of a state law is to regulate conduct occurring wholly outside the state, the burden on commerce is generally held impermissible, and the fact that the law may not have been intended as protectionist or discriminatory will not save it." *United States Brewers' Ass'n., Inc. v. Healey,* 692 F.2d 275, 279 (2d Cir.1982).

While the application of North Carolina's common law of disparagement to extra-territorial conduct in this case is only incidentally burdensome, inasmuch as, (1) there is a rational predicate therefor and (2) all states recognize such cause of action, the same is not true as to the application of the treble damage penalty to such extra-territorial conduct. As previously indicated, the treble damages penalty is one of arbitrary magnitude and enactment, and to permit numerous states to apply damage penalties of arbitrary multipliers to extra-territorial conduct, nothing else appearing, would be to permit several states to apply damage penalties with different multipliers to conduct occurring in a single state without their respective borders. Not only would this generate both confusion and forum shopping, but it would also place a significant burden upon a company engaged in interstate commerce to determine the magnitude of its potential liability for multistate conduct. Thus the burden on interstate commerce is not incidental.

Additionally, the conjunctive application of North Carolina's treble damages penalty to extra-territorial product disparagement would be discriminatory as between competitors in North Carolina or competitors with commercial activity (business) in North Carolina, as opposed to plaintiffs in a state other than North Carolina complaining of a third party's extra-territorial conduct. For example, assume that a North Carolina corporation and an Ohio corporation both complain of losing sales at a mutual customer's plant in New York by reason of Owens-Corning's hit team presentation. In such event, the Ohio corporation would not have the ability to choose North Carolina as a forum state, inasmuch as it is not a competitor within that state nor does the conduct relate to an attempt to destroy its business in North Carolina under § 75–5(b)(3). The absence of such relationship to North Carolina would preclude the application of North Carolina law, with its concomitant treble damage penalty, to the extra-territorial disparagement conduct of Owens-Corning as it relates to the Ohio corporation. Conversely, the North Carolina corporation would have the ability to have North Carolina's disparagement law and concomitant treble damage penalty applied by virtue of its physical location or the location of its commercial activity within North Carolina's borders. This discriminatory effect certainly would have the consequence of discriminating in favor of the North Carolina corporation with regard to Owens-Corning's New York conduct, as opposed to the rights of the Ohio corporation, the latter being without North Carolina contacts.

In summation, the conjunctive application of extra-territorial disparagement with the treble damage penalty provided by § 75–16 is both burdensome and discriminatory without anything to be weighed in the balance to sustain the law. For the foregoing reason, such conjunctive application violates the commerce clause, and its application to extra-territorial conduct is precluded. Of course, § 75–16 remains appli-

cable to conduct occurring in North Carolina which occasioned damage to the plaintiff.

### D. *The Lanham Act*

Plaintiff's third claim for relief, as contained in its Second Amended and Consolidated Complaint filed January 14, 1986, arises under § 43 of the Lanham Trademark Act, 15 U.S.C. § 1125(a). Plaintiff alleges violations of this statute with respect to conduct pertaining to two separate divisions of its business—its manufactured housing division and its site-built housing division. First, plaintiff contends that the following statements allegedly made by the defendant relating to plaintiff's manufactured housing business are proscribed by the Lanham Act:[10]

(a) rockwool loosefill insulation is not suitable for use in the ceilings of manufactured housing;

(b) rockwool loosefill insulation installed in manufactured home ceilings will settle and shift during transportation of the home to the extent that it is impossible for a manufacturer using rockwool loosefill to achieve its design thermal performance for the ceiling;

(c) installing rockwool loosefill insulation in manufactured home ceilings is a complex process requiring extensive training, highly skilled labor, and more management, planning, supervision and

quality control time than installing fiberglass batt insulation; and

(d) rockwool loosefill insulation causes sagging of manufactured home ceilings.

Plaintiff also contends that the following statements allegedly made by the defendant about its own products are proscribed by the Lanham Act:[11]

(a) fiberglass batt insulation is superior to rockwool loosefill insulation for use in mobile homes;

(b) installing fiberglass batts requires less skill, supervision, quality control and other management time than installing rockwool loosefill; and

(c) the design thermal performance is guaranteed with fiberglass batts but highly uncertain with rockwool loosefill insulation.

Secondly, plaintiff contends that statements allegedly made by the defendant with respect to plaintiff's site-built housing operations are in violation of the Lanham Act in that:[12]

(a) Owens-Corning characterized the Casa Grande products based on a statistically inadequate sampling;

(b) Owens-Corning's statements were based on tests of products that were not representative of products being produced by Casa Grande at the time the statements were made;

---

10. Plaintiff relies on the following documents in support of its contentions in this regard:

a. the script of Owens-Corning's "Hit Team" presentations on the subject of the relative merits of rockwool loosefill and fiberglass batt insulation for use in manufactured home ceilings. Doc. Nos. 102545–2581;

b. an Owens-Corning publication entitled "Loosefill Insulation in Manufactured Home Ceilings—A Case History." Second Amended and Consolidated Complaint, Exhibit 1.

c. an Owens-Corning technical bulletin on the use of loosefill insulation in manufactured homes. Doc. No. 101992;

d. letters from Owens-Corning personnel to manufactured housing customers. Doc. Nos. 101285–1286, 101294–1295, 101296–1297, 101583–1585, 101688–1689;

e. Owens-Corning's Techno-Economic Analysis on the use of loosefill insulation in manufactured home ceilings. Doc. Nos. 102250–2254.

See Affidavit of plaintiff's expert David Wylie Yarbrough at p. 2, filed on January 21, 1986, in conjunction with plaintiff's Supplemental Memorandum regarding the parties' Motions for Summary Judgment. (Note: the above-listed documents are contained in Appendix II to Plaintiff's Response to Defendant's Motion for Summary Judgment.)

11. See footnote 1.

12. In support of its contentions in this regard, plaintiff relies on a letter published by defendant on May 6, 1983, which discussed plaintiff's Casa Grande rockwool batts. Second Amended and Consolidated Complaint, Exhibit 2. This letter was distributed by defendant to various customers, listed in Document Numbers 103302–3325. (contained in Appendix II to Plaintiff's Response to Defendant's Motion for Summary Judgment).

(c) Owens-Corning falsely stated that contractors using any Casa Grande products were in violation of the FTC Home Insulation Rule and were subject to a $10,000.00 fine for each use of the products; and

(d) contrary to the assertions of Owens-Corning, the performance of all but one of the Casa Grande products was within the bounds of performance and variability experienced by the mineral fiber insulation industry generally and by Owens-Corning in particular.

Plaintiff also contends that a statement allegedly made by the defendant about its own product is proscribed by the Lanham Act in that defendant allegedly represented to contractors and builders that the thermal performance of its batts insulation products is superior to that of plaintiff's products, when defendant's testing of all but one of the Casa Grande products did not show these products to be inferior to defendant's products.[13]

Defendant moves for summary judgment on two bases: first, defendant contends that plaintiff has failed to identify any "false statements of fact" that Owens-Corning has made about its own products which occurred within the alleged damage period other than the May 6, 1983, Casa Grande batt letter. Defendant maintains that an essential element of a cause of action under 15 U.S.C. § 1125(a) is proof of false statements about one's *own* product —i.e. false representations of fact as to a plaintiff's product are not proscribed by the Lanham Act. Second, defendant asserts that plaintiff has failed to identify any credible evidence as to any injury it might have sustained as a result of any allegedly false statements by Owens-Corning regarding its products.

Conversely, plaintiff asserts that its Second Amended and Consolidated Complaint specifically alleges false representations made by Owens-Corning about its own product to manufactured housing customers. Furthermore, plaintiff maintains that the Lanham Act proscribes false state-

ments about one's own product *or* about a competitor's product, the latter of which also have been alleged specifically. Finally, plaintiff contends that it has made sufficient allegations of injury and damage to support its Lanham Act claim.

Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a) provides in part that:

> Any person who shall affix, apply, ... or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The parties are in agreement that the elements of a false advertising claim arising under the Lanham Act are:

> (1) In its comparison advertisements, defendant made false statements of fact about its own product [these "statements" may be the product of affirmative misleading statements, or partially correct statements or failure to disclose material facts]; (2) those advertisements actually deceived or have the tendency to deceive a substantial segment of their audience; (3) such deception is material, in that it is likely to influence a purchasing decision; (4) defendant caused its falsely advertised goods to enter interstate commerce; and (5) plaintiff has been or is likely to be injured as a result of the foregoing either by direct diversion of sales from itself to defendant, or by lessening in the good will which its products enjoy with the buying public. *Skil Corporation v. Rockwell Interna-*

13. See footnote 3.

tional Corp., 375 F.Supp. 777, 783 (N.D. Ill.1974).

The Lanham Act is not limited to cases of "palming off" or misappropriation of trademarks. 15 U.S.C. § 1125(a) unquestionably proscribes false representations of material facts concerning one's own product. *Fur Information & Fashion Council, Inc. v. E.F. Timme & Son, Inc.*, 364 F.Supp. 16 (S.D.N.Y.1973), *aff'd*, 501 F.2d 1048 (2d Cir.1974); *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272 (2d Cir.1981); *Skil Corporation v. Rockwell International Corp.*, 375 F.Supp. 777 (N.D.Ill.1974); *Gold Seal Co. v. Weeks*, 129 F.Supp. 928 (D.D.C.1955), *aff'd sub nom, S.C. Johnson & Son, Inc. v. Gold Seal Co.*, 230 F.2d 832 (D.C.Cir.1956), *cert. denied*, 352 U.S. 829, 77 S.Ct. 41, 1 L.Ed.2d 50; *U-Haul International, Inc. v. Jartran, Inc.*, 522 F.Supp. 1238 (D.Ariz.1981), *aff'd*, 681 F.2d 1159 (9th Cir.1982). The question here is whether or not the statute proscribes false statements about a competitor's product as well. For the following reasons, this court holds that the Lanham Act, 15 U.S.C. § 1125(a), applies solely to misrepresentations relating to one's own goods; such misrepresentations may be embodied in comparisons between one's own product and that of another, but the Lanham Act only embraces a false description or representation of one's own goods.

An examination of the plain language of § 1125(a) evidences that "its purpose was to prevent false descriptions of the goods *being offered.*" *Fur Information & Fashion Council, Inc.*, 501 F.2d at 1051–52. (emphasis added). "Unfair competition, and commercial disparagement, except as they might be incidental to false representation, are not embraced within the statute." *Id.* at 1052. Section 1125(a) "embodies a departure ... from the common law action for trade disparagement." *U-Haul International, Inc.*, 681 F.2d at 1162. As the district court in *Gold Seal Co. v. Weeks* stated, the Lanham Act "means that wrongful diversion of trade resulting from false description of one's products invades that interest which an honest competitor has in fair business dealings—an interest which the courts should and will protect...." 129 F.Supp. at 940.

Various types of statements are proscribed by the Lanham Act. A statement actionable under the Lanham Act may be the product of an affirmatively misleading statement, a partially correct statement, or a failure to disclose a material fact or facts. *Skil Corp.*, 375 F.Supp. at 783 n. 11. Furthermore, because a statement can be literally true yet misleading in the way it is presented, the "objective truthfulness [of a statement] does not immunize ... [that statement] from scrutiny under the Lanham Act." *McNeilab, Inc. v. American Home Products Corp.*, 501 F.Supp. 517, 524 (S.D.N.Y.1980). Finally, statements made in comparative terms concerning the qualities and relative performance of one's own product are also actionable under the Lanham Act. This latter category of statements must be examined closely, however, as it is the source of varying interpretation.

The bulk of the cases involving such comparative statements address claims arising out of comparative advertisements. *See, e.g., Skil Corporation v. Rockwell International Corporation*, 375 F.Supp. 777 (N.D.Ill.1974); *American Home Products Corporation v. Johnson & Johnson*, 436 F.Supp. 785 (S.D.N.Y. 1977), *aff'd*, 577 F.2d 160 (2d Cir.1978); *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272 (2d Cir.1981); and *U-Haul International, Inc. v. Jartran, Inc.*, 522 F.Supp. 1238 (D.Ariz.1981), *aff'd*, 681 F.2d 1159 (9th Cir.1982). The gist of these actions is that the business of the plaintiff was and/or is presently being injured by advertisements of the defendant, in that such advertisements make false and misleading factual statements and comparisons of the companies' respective products which compete with each other in interstate commerce. A critical factor in each of these cases is that the statements at issue were made by the defendant, directly or indirectly through comparative advertisements with plaintiff's product, about de-

fendant's *own* product.[14] These cases illustrate that § 1125(a) encompasses only misrepresentations with reference to the quality or characteristic of defendant's product. Such misrepresentations about one's own product may be derived from defendant's flat assertions about the product or from a comparison with the product of another. Disparagement of another's product, however, is not proscribed by § 1125(a). *Fur Information & Fashion Council, Inc.*, 501 F.2d at 1052.[15]

As previously indicated in footnotes 10–13, plaintiff relies on the following documents in support of its Lanham Act claim:

(a) the script of Owens-Corning's "Hit Team" presentations on the subject of the relative merits of rockwool loosefill and fiberglass batt insulation for use in manufactured home ceilings. Doc. Nos. 102545–2581;

(b) an Owens-Corning publication entitled "Loosefill Insulation in Manufactured Home ceilings—A Case History." Second Amended and Consolidated Complaint, Exhibit 1;

(c) an Owens-Corning Technical Bulletin on the use of loosefill insulation in manufactured homes. Doc. Nos. 101992;

(d) letters from Owens-Corning personnel to manufactured housing customers. Doc. Nos. 101285–1286, 101294–1295, 101296–1297, 101583–1585, 101688–1689;

(e) Owens-Corning's Techno-Economic Analysis on the use of loosefill insulation in manufactured home ceilings. Doc. Nos. 102250–2254; and

(f) a May 6, 1983, letter published by defendant to various customers, which discussed plaintiff's Casa Grande rockwool batts. Second Amended and Consolidated Complaint, Exhibit 2; Doc. Nos. 103302–3325.

By letter to counsel for defendant dated January 22, 1986, counsel for plaintiff narrowed its claim of Lanham Act violations, limiting it to the following documents:

(a) the "Hit Team presentation" (Doc. Nos. 10245–2581);

(b) the "White Paper" (Second Amended and Consolidated Complaint, Exhibit 1);

(c) the June 15, 1981, technical bulletin (Doc. No. 101992); and

(d) the Techno-Economic Analysis (Doc. Nos. 102250–2254).

---

**14.** *Skil Corporation* involved statements made by defendant, "in comparative and absolute terms, concerning the qualities and relative performance of its own product and those of … [plaintiff]." 375 F.Supp. at 780. The court held that § 1125(a) gives rise to a cause of action where, in comparison advertising, a company makes false representations of material fact concerning its own product. Id. at 784.

In *American Home Products Corporation*, certain superiority claims of "Anacin," over "Tylenol" were at issue. The only statements involved were those the counterclaim defendant allegedly made about its product, "Anacin." Specifically, the following claims made by defendant were alleged to be violative of § 1125(a):

(A) that Anacin is a superior analgesic to Tylenol;

(B) that Anacin is an efficacious anti-inflammatory drug for the conditions listed in the advertisements;

(C) that Anacin provides faster relief than Tylenol; and

(D) that Anacin does not harm the stomach. 577 F.2d at 163.

At issue in *Vidal Sassoon, Inc.* were certain misstatements about test results comparing de-

fendant's *Body on Tap* shampoo with plaintiff's product, and the manner in which the tests were conducted. These statements were held to be actionable as misrepresentations about defendant's product under § 1125(a), in that the total effect of the advertisements was "to lead consumers into believing that *Body on Tap* was competitively superior." 661 F.2d at 278.

Finally, in *U-Haul International, Inc.*, certain descriptions by defendant *Jartran* about its services in comparison to those of *U-Haul* were held to be violative of § 1125(a) in that they "falsely represented certain aspects of the quality and characteristics of *Jartran's* goods and services." 681 F.2d at 1160. (emphasis added).

**15.** This court is not in agreement with the language in the district court opinions in *American Home Products* and *U-Haul International* which seems to indicate that statements falsely disparaging a competitor's product state a claim under § 1125(a). 436 F.Supp. at 791; 552 F.Supp. at 1247. Furthermore, this language was not adopted by the respective circuit courts when these cases were decided on appeal. 577 F.2d 160; 681 F.2d 1159.

Additionally, counsel "high-lighted" the statements contained in these documents which plaintiff contends amount to false and misleading statements regarding defendant's own products in violation of the Lanham Act. The statements on which plaintiff now bases its Lanham Act claim are the following:

*Hit Team Presentation*

(1) "This type of process (loose-fill rockwool) requires far more quality control, and it's much more difficult. With batts, OC is very easy. You can see the batts. If they are layered, you can see the layers. You can usually tell by looking what the R-value is, as well, *most important*, you are guaranteed of the R-value." p. 102576.

(2) The language cited is identical to the language in paragraphs 6 and 8 of the White Paper referred to below under the heading "Disadvantages," p. 102578

(3) *Id.* p. 102579.

(4) The language cited is identical to the language in paragraphs 1 and 2 of the White Paper referenced to below under the heading "Advantages."

(5) The language cited is quite similar to the language in paragraph 5 of the White Paper referred to below under the heading "Advantages."

(6) Points 1, 2 and 5 on page 102581 of the hit team presentation are either identical or quite similar to the statements listed under "Advantages" on page 8 of the White Paper.

*White Paper*

(1) "The R-value of fiberglass batt insulation is inherent to the product ..." p. 5

(2) "First, lighter weight insulation tends to minimize any ceiling sag problems, either with wood fiber or gypsum board ceilings." p. 5

(3) *Disadvantages* (of rockwool Loose-Fill)

"6. Requires more extensive quality control inspections and requires more management and supervisory time and attention in order to assure a quality installation" p. 8

(4) *Advantages* (of batts)

"1. R-value is intrinsic to the batt product." p. 8

"2. Requires less installer skill and knowledge, more mistake proof." p. 8

"5. Results in less waste being generated during installation process." p. 8

(5) *Conclusion* ... "batt insulation, on the other hand, offers assured R-value, simple installation, and represents consistent and proven results for the home manufacturer as well as the ultimate homeowner." p. 8

*Technical Bulletins*

(1) "Loose-fill requires more supervision and management time to assure a proper insulation, and it requires more time spent on proper coverage and more quality control inspection to assure proper insulating value." p. 102830

(2) "Batt insulation, on the other hand, has a consistent R-value, and the installation of batts does not require extensive quality control checks to assure proper R-value."

(3) "Batt insulation requires less operator skill and knowledge, and as a result, there are fewer installation errors with batts." p. 102830.

(4) "For these reasons, we feel that batt and blanket insulation is a more viable alternative for insulating mobile home ceilings." p. 102830.

*Loose-Fill versus Batt Material—the Techno-Economic Analysis Disadvantages*

"4. Requires more supervision and management time in order to assure quality installation." p. 102254.

"6. Requires more quality control inspection." p. 102254.

*Advantages*

"1. Assured R-value."

"2. Requires less installer skill and knowledge; more mistake-proof."

For purposes of this summary judgment motion, the court finds that these statements are sufficient to support plaintiff's Lanham Act claim. The court notes, however, that proving the falsity of these statements would be difficult in that plaintiff would have to show the standards by which the veracity of the statements could be judged. For example, the quality and degree of "quality control" may be compared to an objective industry standard, or to the subjective standard of the party making the comparison. In the view of the court, the former must be used in order to find a violation of the Lanham Act. The plaintiff, therefore, must prove the existence and paramaters of such a standard in order to show the falsity of a "quality control" statement. In entering this order, the court assumes plaintiff could establish a suitable industry standard.

In conjunction with its Lanham Act claim, plaintiff seeks both injunctive and monetary relief. It is important to note that consumer deception is an integral part of *any* claim under 15 U.S.C. § 1125(a). To establish a right to damages, a plaintiff must prove the falsity of the statement in question and also that the statement actually deceived a portion of the buying public. *Hesmer Foods, Inc. v. Campbell Soup Co.*, 346 F.2d 356, 359 (7th Cir.1965); *see also Skil Corporation*, 375 F.Supp. at 783; *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 (3rd Cir.1958). In addition, although the plaintiff is "not required to prove the amount of damages with mathematical certainty," *U-Haul International, Inc. v. Jartran, Inc.*, 601 F.Supp. 1140, 1150 (D.Ariz. 1984), "pecuniary recovery must be individualized, loss of sales must be shown." *Gold Seal Co. v. Weeks*, 129 F.Supp. at 940. Such detailed individualization of loss of sales, however, "goes to the quantum of damages and not to the very right to recover." *Parkway Baking Co.*, 255 F.2d at 648.

In contrast, the quantum of proof required to obtain injunctive relief is much less than that required for monetary damages. A plaintiff need only show that the false statement has a tendency to deceive—i.e., a likelihood of consumer deception. *Hesmer Foods, Inc.*, 346 F.2d at 359; *Skil Corporation*, 375 F.Supp. at 783; *Parkway Baking Co.*, 255 F.2d at 649. Although "something more than a plaintiff's mere subjective belief that he is injured or likely to be damaged is required," *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir.1980), a plaintiff seeking an injunction "need not quantify the losses actually borne." *Id.* Furthermore, the plaintiff need not come forward with specific evidence that the statements at issue actually resulted in some definite loss of sales. *Id.* at 190; *see also Vidal Sassoon, Inc.*, 661 F.2d at 278. Rather, plaintiff need only show that it and the defendant are competitors within a certain market and that defendant's alleged statements could logically affect plaintiff's sales market. *Id.* Such a showing establishes a reasonable belief on the part of the plaintiff that it is likely to be damaged within the meaning of § 1125(a), and it will be entitled to injunctive relief. *Id.* In addition, "the possibility that the total pecuniary harm to ... [plaintiff] might be relatively slight does not bar injunctive relief." 631 F.2d at 191. As stated by the Second Circuit Court of Appeals:

[s]ound policy reasons exist for not requiring proof of actual loss as a prerequisite to § 43(a) injunctive relief. Failure to prove actual damages in an injunction suit, as distinguished from an action for damages, poses no likelihood of a windfall for the plaintiff. The complaining competitor gains no more than that to which it is already entitled—a market free of false advertising. 631 F.2d at 192.

Finally, the court notes that a false statement actionable under the Lanham Act must be distinguished from mere "puffing," which is not actionable thereunder. "Puffing" refers generally, "to an expression of opinion not made as a repre-

sentation of fact." *Gulf Oil Corp. v. Fed. Trade Comm'n*, 150 F.2d 106, 109 (5th Cir.1945) (citations omitted).

### E. *Causation*

■ The court concludes its discussion of non-evidentiary issues with the following comments on the standard of proximate cause to be applied to the various claims of the plaintiff. It is the court's view that the standard for establishing proximate cause as an element of plaintiff's claims under N.C.Gen.Stat. §§ 75–1.1, 75–5(b)(3) and 75–16, the federal Lanham Act and the common law torts of unfair competition and disparagement are essentially the same. § 75–16 provides a right of action to any person who is injured or whose business is broken up by a violation of §§ 75–1.1, 75–5(b), or any other provision of Chapter 75. Under § 75–16, the North Carolina courts apply the standard of proximate cause articulated in federal antitrust cases. More specifically, the North Carolina Pattern Jury Instructions (hereinafter "N.C.P.I.") state that "plaintiff must prove that the defendant's conduct was a substantial cause of [plaintiff's injury] [the injury to plaintiff's business], and ... that [his injury] [the injury to his business] was a type of injury which defendant's conduct was naturally likely to cause." N.C.P.I.—Civil § 813.70. The instructions cite a number of federal antitrust cases in support of this definition of proximate cause, and refer specifically to *Zenith Radio Corp. v. Hazeltine Research Corp.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129, *on remand to* 418 F.2d 21 (7th Cir.1969).

The pattern jury instructions further provide that

> Plaintiff does not have to prove that the defendant's conduct was the only cause or even the predominant cause of [his injury] [the injury to his business] but only that it was a substantial cause. [Plaintiff's injury] [the injury to plaintiff's business] may be caused by several

things, but the plaintiff's right to recovery in this action is not denied because other causes in addition to defendants conduct substantially contributed to the injury.
N.C.P.I.—Civil § 813.70.[16]

■ A similar standard has been applied in Lanham Act, disparagement and unfair competition cases. For example, in *U-Haul International, Inc. v. Jartran, Inc.*, 601 F.Supp. 1140 (D.Ariz.1984), the District Court awarded U-Haul $40,000,000 in damages plus attorneys' fees after finding that Jartran violated the Lanham Act and the common law of unfair competition and trade disparagement. Jartran had entered the one-way transportation market with a series of newspaper advertisements that misleadingly compared its prices and the quality of its trucks with U-Haul's. The court held that "to prove actual deception of the buying public, plaintiff in this case need only show by competent surveys that the number of members of the buying public who are deceived, is not insignificant." 601 F.Supp. 1149. It went on to state that "the causation element of this disparagement claim is met when the evidence establishes that the disparaging statements were a substantial factor in causing pecuniary loss. Plaintiff need not prove losses to specific customers." *Id.* at 1150. *Accord, Restatement (Second) Torts*, § 633 ("the publication of an injurious falsehood is a legal cause of pecuniary loss if (a) it is a substantial factor in bringing about the loss, and (b) there is no rule of law relieving the publisher from liability because of the manner in which the publication has resulted in the loss."). In the last analysis, as to each of plaintiff's various causes of action, it is only necessary that plaintiff demonstrate that defendant's illegal conduct was a substantial cause of injury to plaintiff's business. Plaintiff is not required to prove that the defendant's conduct was the only or even the predominant cause of this injury.

---

**16.** *Compare* Devitt and Blackmar, *Federal Jury Practice and Instructions,* §§ 80.18, 80.19, § 90.-31.

Plaintiff also must show that the injury suffered is of a type which defendant's conduct was naturally likely to cause. *Continental Oil Company v. Union Carbon Corp.*, 370 U.S. 690, 697 n. 7, 82 S.Ct. 1404, 1409 n. 7, 8 L.Ed.2d 777 (1962). A defendant may attempt to show that the decline in plaintiff's profits or the loss of sales in its business was not caused by illegal acts, but instead resulted from other factors, such as change, economic conditions or mismanagement. Where such evidence is offered, however, resolution of the issue is for the trier of fact. *Clipper Express, Inc. v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1266 n. 37 (9th Cir.1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983).

We now turn to a discussion of the evidentiary issues as applied to each of plaintiff's claims. In other words, the court now discusses whether or not there are material issues of fact as to one or more of the plaintiff's claims which would warrant the submission of such claim or claims to the jury. Plaintiff's claims in this regard will be discussed *seriatim*.

### F. *Evidentiary Issues*

At the outset, the court notes that prior denial of summary judgment does not rule out the possibility of a subsequent directed verdict. *Farrell v. Hollingsworth*, 43 F.R.D. 362, 365 (D.C.S.C.1968); *Gross v. Southern Railway Co.*, 446 F.2d 1057, 1060 (5th Cir.1971); 5 Moore, Federal Practice (2d Ed.1982) ¶ 50.03[4]. This tenet is important in that the evidence presented on these motions for summary judgment raises very close questions as to its sufficiency in proving causation of injury and damage.

Defendant argues that plaintiff's evidence of proximate cause and damage as to each of its claims—those based on disparagement as well as false advertising—is insufficient as a matter of law for a jury to conclude that defendant's activities injured the plaintiff. Defendant maintains that because not a single one of the 76 insulation contractors and mobile home manufacturers listed by the plaintiff in its Identification of Customer Accounts has testified that his company did not purchase American Rockwool products because of defendant's allegedly illegal activities, the evidence of proximate cause cited by the plaintiff consists solely of speculation and innuendo. Therefore, defendant contends that plaintiff's evidence is insufficient as a matter of law to allow a jury to infer that defendant has caused plaintiff any legally cognizable injury. Defendant also contends that plaintiff's evidence as to damages is insufficient in that the sole evidence offered by the plaintiff is the oral testimony of the plaintiff's officers and its accountant. Defendant contends that plaintiff's expert merely performs the mechanical function of computing the figures given him by the plaintiff. Additionally, defendant argues that plaintiff's evidence as to injury and damage is deficient in that plaintiff is unable to differentiate between possible causes of lost sales. These possible causes range from quality problems in plaintiff's product, weather problems, or defendant's alleged misconduct; defendant maintains that plaintiff's inability to distinguish between these various causal factors is fatal to its damage claim. Finally, defendant contends that plaintiff's problems in showing injury and damage are compounded by the fact that plaintiff's business was increasing at a phenomenal rate during the relevant time period, as opposed to declining during this period.

Conversely, plaintiff contends that a genuine issue of proximate cause is raised in this case by documentary evidence showing the relationship between defendant's misconduct and customer purchasing decisions. These documents consist of defendant's written accounts at the time of the activities in question of the effect of its activities on customers; plaintiff's contemporaneous and subsequent written accounts of the effect of defendant's activities; and documents obtained from customer files. In addition, plaintiff offers the testimony of a marketing expert witness as to the effect of defendant's disparagement of plaintiff's

product and false statements about its own product on the customers' purchasing decisions. This expert theorizes that in light of the inherent persuasive nature of defendant's representations to customers, in conjunction with these customers' heavy reliance on information furnished to them by suppliers in making purchasing decisions, defendant's activities in this case probably resulted in customers changing from American Rockwool as a supplier. This same expert also identifies several problems with respect to the ability of industrial purchasers to accurately describe why they make purchasing decisions; this evidence is offered to explain why various customers testified that they did not believe that they were influenced in their purchasing decision by any information supplied by Owens-Corning. Moreover, plaintiff contends that a view of the entire customer deposition in the context of other testimony and documents generated at the time of defendant's marketing activities, reflects a very real effect on American Rockwool's ability to sell its products as a result of these disparaging and false remarks.

■■■ A single set of operative facts is applicable to plaintiff's claim under N.C. Gen.Stat. § 75–1.1, its claim of disparagement, and its claim of unfair competition, so that in effect only a single issue will go to the jury which will be applicable to these three types of claims. After reviewing plaintiff's evidence of causation and damage, this court finds that, with one exception, there are genuine issues of fact as to disparagement and whether or not it caused plaintiff's injury and if so, as to the amount of damage. As to this exception, the court finds that there is insufficient evidence to support plaintiff's claim that it has been deprived of any floor insulation business by defendant's activities. In this regard, plaintiff argues that as a result of defendant's conduct, plaintiff had to spend its time answering concerns about the use of the product in ceilings, thereby curtailing its efforts to develop the use of the product in floors. This court finds that there is insufficient evidence for a jury to find that the plaintiff was deprived of any

floor business in that it is entirely conjectural and speculative as to whether or not there would have been technical developments enabling plaintiff to market its product for this purpose. Accordingly, defendant's motion for summary judgment is GRANTED with respect to plaintiff's claim of injury and damage in the flooring business. Defendant's motion for summary judgment with respect to plaintiff's remaining claims under § 75–1.1 and the common law of disparagement and unfair competition is DENIED.

■■■ After reviewing plaintiff's claim under N.C.Gen.Stat. § 75–5(b)(3), this court concludes that defendant's motion for summary should be granted for the following reasons:

As discussed previously in this order, § 75–5(b)(3) provides that it is unlawful to willfully destroy or injure or attempt to destroy or injure the business of any competitor in North Carolina with the purpose of attempting to fix the price of any goods when the competition is removed. The conduct found violative of the statute in the reported North Carolina decisions pertaining to this section involves willful, predatory, individual or conspiratorial pricing to destroy or injure a competitor, with the intention of raising prices when the competitor is removed. The case at bar has evolved into one involving claims for disparagement and false advertising; this court is not willing to expand the reach of § 75–5(b)(3) to cover defendant's conduct alleged herein. There is no evidence in this case from which a jury could conclude that the defendant reduced its prices, thereby violating its own self interest, so that it could thereafter fix or attempt to fix prices when its competition was destroyed. The alleged disparagement occurring in the case at bar, which is the predicate for plaintiff's § 75–5(b)(3) claim, could have been perpetrated solely for the purpose of retaining the market share; there is no evidence from which the purpose to subsequently fix prices, once the competition or competitor was destroyed, can be found.

Evidence of a party operating to its detriment would enable a jury to infer reasonably therefrom that this same party would increase prices later to compensate it for losses suffered. No such evidence is present herein. Therefore, defendant's motion for summary judgment with respect to plaintiff's § 75–5(b)(3) claim is hereby GRANTED.

 For the reasons discussed with respect to plaintiff's § 75–1.1 and common law disparagement and unfair competition claims, defendant's motion for summary judgment with respect to plaintiff's Lanham Act claim is DENIED.

## IV. DEFENDANT'S COUNTERCLAIM

The gist of defendant's counterclaim is that plaintiff has made false and misleading statements about the performance characteristics of its "Spring Brand" and "American" rockwool insulation, which have deceived and are likely to continue to deceive customers in their purchasing decisions. These statements allegedly have been made on the product labels themselves, as well as orally and in writing to various customers of plaintiff and defendant, in violation of Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a), and the common law of unfair competition.

Defendant contends that plaintiff has mislabeled and misrepresented its loosefill insulation products with respect to both coverage and thermal performance.[17] To support its contentions, defendant conducted 34 coverage tests and 60 thermal tests of plaintiff's loosefill insulation products. Based on Owens-Corning's 34 coverage tests,[18] defendant's experts concluded that plaintiff's loosefill insulation products are mislabeled with regard to coverage because they cannot be installed at label density. Based on defendant's 60 thermal tests,[19] Owens-Corning's experts concluded that plaintiff's loosefill is mislabeled with regard to thermal performance because if installed in accordance with bag labels, the insulation will provide only 80% of the label R-value.

Specifically, with respect to defendant's claim that plaintiff has misrepresented and mislabeled its loosefill insulation product, defendant alleges the following:

Based on the results of certain thermal testing performed in Owens-Corning's Granville laboratories, defendant contends (through testing) the thermal conductivity of the material at that density, the manufacturer can calculate the thickness of material needed to provide various R-values. The manufacturer can then calculate how many bags of loosefill material are necessary to insulate a given area to various thicknesses and R-values.

Like other insulation manufacturers, American Rockwool provides customers with labels, coverage charts and other literature which indicate, among other things, the minimum thicknesses and the number of bags of material required to achieve various R-values for a given area. It is this product literature disseminated by American Rockwool which Owens-Corning contends is false or misleading. Plaintiff's Memorandum at 5. (citations omitted).

**17.** In its brief in support of the motion for summary judgment, plaintiff accurately set forth a brief review of the terms and concepts involved in thermal insulation testing and labeling:

The thermal performance of insulation products is typically advertised in terms of R-value, or resistance to heat flow. R-value is a mathematical function of the thickness (T) and thermal conductivity (K) of the material. Specifically, R-value is directly related to thickness and inversely related to thermal conductivity: as thickness increases, so does R-value; as thermal conductivity decreases, R-value increases. Thermal conductivity is measured using equipment and procedures specified in the American Society for Testing and Materials' ("ASTM") Annual Book of Standards and varies with the density of the material. (In the ranges relevant to the issues herein thermal conductivity and R-value improve as the density of the material increases.)

To label a loosefill insulation product, the manufacturer must determine a density at which the product can realistically be installed ("label density"). After determining

**18.** A coverage test is designed to determine if a product will cover a specified area of a ceiling at the thickness and density represented on the bag label.

**19.** A thermal test is designed to determine the thermal performance capability of a given insulation product.

that American Rockwool has mislabeled its loosefill rockwool insulation from late 1983 to the present with respect to thermal performance, and has thereby violated Federal Trade Commission Rule 460 during that period.[20] Owens-Corning contends that certain manufactured housing customers would not have purchased American Rockwool's products and would have elected to purchase Owens-Corning's products instead had the label been consistent with Owens-Corning's test results.

Defendant also contends that its testing and other materials indicate that American Rockwool loosefill cannot be blown to the density indicated on the bag label, and therefore as a result of having to install American Rockwool loosefill at higher than label density, customers must use more material to insulate a given area to the desired thickness and R-value than American Rockwool represents will be required. Similarly, Owens-Corning asserts that had American Rockwool's coverage charts been prepared in a manner consistent with Owens-Corning's test results, certain manufactured housing customers would have elected to purchase Owens-Corning's batt products rather than American Rockwool's loosefill.

Plaintiff attacks defendant's Lanham Act claim on two bases:[21] First, plaintiff contends that defendant cannot prove that plaintiff's bag labels are false with respect to the performance characteristics of its loosefill insulation; second, plaintiff argues that even assuming the falsity of its bag labels, defendant cannot prove that it was injured thereby. The court will address these claims *seriatim.*

In conjunction with the assertion that its bag labels are not "false" within the meaning of the Lanham Act, plaintiff maintains that the court should focus on what the label represents about the product. In this vein, plaintiff contends that the labels are merely reasonable estimates of the loosefill's density and thermal capacity, and defendant's evidence of varying lab results does not show that the labels were false. Plaintiff primarily relies on the fact that it labeled its products in accordance with test results obtained from a government-certified laboratory (Dynatech), such tests being conducted pursuant to test procedures established by the Federal Trade Commission. Because it has proceeded in an appropriate fashion—i.e., engaged a certified laboratory to test its product and relied on that laboratory's test results in marketing the product—plaintiff maintains that the labels are not "false" and thereby proscribed by the Lanham Act. Conversely, defendant contends that its evidence as to both density and thermal performance of plaintiff's loosefill product, which consists in part of numerous test results, is sufficient evidence from which a jury could conclude that plaintiff knew or should have known of the falsity of its bag labels. *Bundy Corp. v. Teledyne Industries, Inc.,* 748 F.2d 767 (2d Cir.1984).

With reference to the blown density of American Rockwool's loosefill, defendant points out that it has conducted 34 tests of representative samples of this product.[22]

**20.** 16 C.F.R. § 460.12 requires manufacturers of insulation to label their products with respect to R-value (thermal performance) and other characteristics. Section 460.8 requires that the R-value of any insulation sold by manufacturers and other industry members not be more than ten percent below the R-value shown on the manufacturer's label or other promotional material.

**21.** As previously indicated, defendant's counterclaim also asserts a claim for unfair competition under the common law. The factual basis for this claim is identical to the Lanham Act claim: i.e., defendant contends that plaintiff's labels and advertising contained material false statements that deceived or tended to deceive certain manufactured housing accounts, and that such deception caused these customers to purchase plaintiff's insulation for ceilings as opposed to defendant's insulation. Therefore, as stated by the defendant in its response to plaintiff's motion for summary judgment, Owens-Corning's unfair competition claim duplicates the Lanham Act claim and it rises or falls on the same grounds.

**22.** Defendant maintains that in order to conduct the tests as to the density and thermal performance of plaintiff's loosefill products, defendant obtained 16 lots of plaintiff's loosefill insulation through purchases by field personnel. These

Defendant maintains that plaintiff's evidence to support its label density is deficient in that—

Plaintiff specified the densities to be tested by Dynatech, relying on competing United States rockwool producers' labels; plaintiff has produced no independent certified laboratory tests establishing the blown density or "coverage" that can be achieved with its product; and plaintiff has produced no evidence that it conducts any internal blown density tests at reasonable machine settings which might be utilized by manufactured housing producers in the field.

As to the thermal capacity of plaintiff's product, defendant points to its 60 thermal tests in support of its contention that plaintiff's loosefill is mislabeled with regard to thermal performance because, if installed in accordance with the bag labels, plaintiff's product will provide only 80% of the label R-value. In contrast to these 60 tests, defendant maintains that plaintiff has commissioned only 7 loosefill thermal tests by Dynatech R/D Company in the seven years American Rockwool has been in business. Defendant contends that this limited number of tests fails to provide an adequate foundation for plaintiff's label claims; rather, defendant contends, its own tests of plaintiff's product provide a more thorough and reliable foundation for characterizing American Rockwool's loosefill.

With respect to both density and thermal performance, defendant contends the record establishes that plaintiff had no empirical basis for its initial bag labels at either the Spring Hope or Casa Grande plants during early stages of plaintiff's operation. Defendant maintains that the evidence shows the following:

Mr. Gould, plaintiff's principal stockholder and chairman, testified that from July, 1978, to October, 1978, the bag labels at Spring Hope were copied from one of his competitors, Rockwool Industries, Inc., and that no tests were conducted to determine whether in fact the two products were identical or even closely similar. Indeed, American Rockwool's earliest test report from Dynatech was mailed on November 16, 1978. Similarly, at Casa Grande, Gould merely adopted the label used by the Del Webb organization, the previous owner of the production facility, with no test data or other basis to support the labels. American Rockwool began operating the Casa Grande facility in October 1982, but did not obtain a test of loosefill produced at that facility until April, 1983.

■■■ For the following reasons, this court finds that there are sufficient issues of material fact as to whether or not plaintiff's bag labels are "false" within the meaning of the Lanham Act, such that plaintiff's motion for summary judgment must be DENIED.

■■■ The particulars of the Lanham Act previously have been discussed by this court in its discussion of defendant's motion for summary judgment with reference to plaintiff's Lanham Act claim. *Supra*, at p. 1438. One further point, however, requires a brief discussion. 15 U.S.C. § 1125(a) provides a remedy against anyone who, in connection with goods or services in commerce uses a false designation of origin or any false description or representation. There is no requirement under the Lanham Act that the falsification occur wilfully and with intent to deceive. *Parkway Baking Co.*, 255 F.2d at 648; *see also Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 647 (6th Cir.1982). All that is required to state a claim of falsity under the Lanham Act is that the representations or descriptions either be "false" or such as tends to falsely represent or describe the goods in question. *Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1 (E.D.Pa.1974). Plaintiff's contention that because it relied on a certified laboratory's test results in making its label representations, these representa-

---

purchases allegedly occurred over a period from October, 1983 to October, 1985. Eight lots were produced at plaintiff's facility in Spring Hope, North Carolina; and eight lots were produced at plaintiff's facility in Casa Grande, Arizona. These lots in turn were shipped to Owens-Corning's Technical Center in Granville, Ohio, for the thermal and coverage testing.

tions cannot be false under the Lanham Act, is simply without merit. If defendant's representations as to what its evidence will show are true, a jury could reasonably find that plaintiff's seven thermal tests of its product in the seven years plaintiff has been in business, in conjunction with its lack of testing as to the density of the loosefill product, were insufficient to support plaintiff's representations on its bag labels. This evidence could support a finding that the plaintiff reasonably should have known that its bag labels were false; again, there is no requirement under the Lanham Act of proof of specific knowledge of the falsity of the representation made.

Plaintiff also argues that, even assuming the falsity of its bag labels, defendant cannot prove that it was injured thereby. The fifth and final element of a Lanham Act claim requires the defendant to show that it has been injured as a result of plaintiff's conduct, either by direct diversion of sales from itself to the plaintiff, or by lessening in the good will which its products enjoy with the buying public. *Skil Corp.*, 375 F.Supp. at 783. For the following reasons, this court finds that the defendant has made a sufficient showing of injury to take its Lanham Act claim to the jury.

First, defendant points out that the evidence will show that the purchasing agents at manufactured housing plants that are purchasing plaintiff's products believe and rely on the thermal value and coverage representations specified on the bag labels. Defendant maintains that it is very important that the bag labels be correct in that the duties and responsibilities of these purchasing agents do not include inspecting the product after it is installed to insure that it meets bag label requirements; in fact, defendant contends that purchasing agents observe the installation process very infrequently. In addition, defendant maintains that the installer relies on plaintiff's bag labels and coverage charts for the assurance that a given number of bags will provide the proper coverage and thermal performance. This reliance is evidenced by most installers' failure to use attic rulers for the purpose of assuring the proper thickness, using instead only a "bag count." A "bag count" merely involves keeping track of the number of bags installed; it involves no tests or other procedures to assure proper thickness or density. Furthermore, defendant alleges that most companies have no independent means of testing the thermal performance of the insulation it installs. A mere visual check of the insulation process is not sufficient to assure that the proper density and thickness is being achieved.

To support its claim of injury, the defendant alleges that it has lost sales of its fiberglass batt products to mobile home manufacturers who now purchase plaintiff's loosefill product for use in mobile home ceilings. Plaintiff contends, however, that Owens-Corning's lost sales were not the result of alleged false advertising or misrepresentations about the performance of plaintiff's product. Instead, plaintiff argues that mobile home manufacturers have purchased plaintiff's product rather than defendant's product primarily because of plaintiff's lower price. Plaintiff then argues that even if its product does not perform as labeled, defendant can claim no injury with customers whose business it lost to plaintiff, because it must prove that the change in the label would result in a change in plaintiff's price to the customer on the square foot basis for a comparable R-value, such that the purchasing agent would not be motivated to change to plaintiff's product. To counter this argument, defendant maintains that plaintiff neglects to mention that the customers who testified that price motivated them to purchase plaintiff's products also testified that they assumed that the products were of comparable R-value to defendant's fiberglass batts, and that the information contained in plaintiff's bag labels, coverage charts, and other literature was accurate. Defendant contends that the customers were deceived because the assumptions upon which they relied in deciding to purchase plaintiff's products were erroneous.

Defendant represents that the evidence will show that in calculating the cost sav-

ings to be realized using plaintiff's product, customers took into account and relied upon plaintiff's information as to R-value and density. If a jury were to determine that this information provided by the plaintiff was in fact false, there would be sufficient evidence from which the jury could conclude that the customers who relied on this information in deciding to purchase plaintiff's product would not have purchased plaintiff's product, but instead would have purchased the defendant's product. An increase in price is not the only important consideration to these purchasing customers. For example, the weight of a product is important in that if additional loosefill must be blown into the ceiling to achieve a given R-value, weight of the ceiling insulation becomes an important factor. If the insulation is too heavy, defendant contends that it can cause ceiling sag, which is not a desirable characteristic. Therefore, the label's representation as to R-value and density are highly important in evaluating the desirability of a given insulation system. Plaintiff's argument that price was the determinative and motivating factor in a customer's decision to use plaintiff's product is speculative in that the customers' testimony seems to reveal that this factor was not the only important factor which they considered. Accordingly, plaintiff's motion for summary judgment is hereby DENIED.

## V. CONCLUSION

To summarize,

Defendant's motion for summary judgment as to plaintiff's § 75–1.1 claim and common law claims of disparagement and unfair competition is DENIED except as to plaintiff's claim for injury and damage as to its flooring business; as to this latter issue, defendant's motion for summary judgment is GRANTED.

---

**23.** On Wednesday, February 5, 1986, the parties agreed to an undisclosed settlement of this action accompanied by a voluntary dismissal with prejudice of all remaining claims. This opinion

Defendant's motion for summary judgment as to plaintiff's § 75–5(b)(3) claim is GRANTED.

Defendant's motion for summary judgment as to plaintiff's Lanham Act claim, which was renewed by motion filed January 29, 1986, is DENIED.

Plaintiff's motion for summary judgment as to defendant's counterclaim is DENIED.

SO ORDERED.[23]

---

is necessary in that it memorializes the court's rulings in this matter which were communicated to the parties telephonically prior to their settlement.